OPINION
{¶ 1} Ashley Anderson ("Ashley") was born on May 1, 1993. After Ashley's parents were divorced, Belinda Sankow ("appellant"), Ashley's mother, maintained custody of Ashley and her younger sister, Megan. Appellant and the girls resided in Connecticut, appellant's home state, while the girls' father, Scott Anderson ("Anderson"), returned to his home state, Ohio. Appellant held custody of the girls until September, 2000 when she telephoned Anderson requesting him to pick them up. According to Anderson, appellant had to give up custody of the girls because she was being evicted from her home and Connecticut's Children Services Board had threatened to remove the girls because they had not been in school for a week.[1] With this in mind, Anderson agreed to drive to Connecticut and retrieve the girls.
 {¶ 2} Anderson arrived in Connecticut on September 1, 2000. At trial, Anderson described the girls' living condition as dirty and unsanitary. According to Anderson, appellant's home smelled of animal urine, trash and beer bottles were strewn about, and the kitchen sink was full of dirty dishes.[2] More disconcerting was the girls' appearance: Ashley and Megan allegedly smelled of urine, their clothes were dirty, they had head lice,[3] and Megan had scabies. Concerned, Anderson took custody of the girls and returned to Warren, Ohio.
 {¶ 3} In the meantime, appellant and her husband, Scott Sankow, moved to Elko, Nevada. While in Nevada, Scott Sankow was employed as a mechanic and a truck driver. Appellant was not employed outside her home but testimony indicated that she kept a website dedicated to the sale of Barbie Dolls. At some point in December, 2000, appellant attempted to regain custody of the girls from Anderson. Appellant testified that she had an agreement with Anderson, of which she presented no independent evidence, whereby she would regain custody of the girls around Christmas, 2000. However, Anderson never acknowledged such an agreement and the girls remained with their father.
 {¶ 4} During her first few months with Anderson, Ashley had difficulty adjusting to her new surroundings. According to Anderson, Ashley took well to his wife, Amanda Anderson; however, she "wanted nothing to do" with Anderson. Ashley refused to accept that Anderson was her real father, as she was of the belief that one Sean Davis, appellant's live-in boyfriend from 1995-1999, was her natural father. However, Ashley gradually became more comfortable with Anderson and eventually recognized him as her father.
 {¶ 5} As Ashley's adjustment got better, she began to communicate openly with the Andersons. In April 2001, after living with the Andersons for nearly seven months, Ashley disclosed that she and her sister were victims of sexual abuse when they lived in Connecticut with appellant. According to Ashley, the alleged perpetrator was Sean Davis, the individual she formerly identified as her father. Anderson sought immediate treatment for Ashley through the Trumbull County Children's Services Board ("CSB"). According to Anderson, CSB assisted him in contacting a therapist to help address any issues attending to the abuse. When appellant was confronted with these allegations in early April 2001, she testified she did not believe the girls. In fact, she testified that she did not accept the allegations until December of 2001.
 {¶ 6} The record indicates that appellant maintained relatively close contact with the girls before the sexual abuse issue arose, calling them once a week via telephone. However, from May, 2001 through November, 2001, appellant's contact dwindled to approximately a telephone call once a month. Appellant had no physical contact with the girls during this time.
 {¶ 7} Even before disclosing the sexual abuse, Ashley exhibited certain deficits which caused Anderson concern. In particular, Ashley was neither able to button her pants nor tie her shoes. Ashley further claimed that she was unable to recite the alphabet. At trial, Anderson additionally pointed out that, near the time she disclosed the sexual abuse, Ashley was reported at school for grabbing a young boy by his privates. When asked why she did this, Ashley communicated that she and a young boy in Connecticut would go into the woods and touch each other. Ashley also admitted that she and Megan would touch each other while in Connecticut. After this admission, Anderson testified that Ashley gradually became more ostentatious regarding the sexual touching of her sister. In fact, Anderson finally resolved to keep the girls separated after he observed them French-kissing in the back seat of the car while he was driving.
 {¶ 8} After disclosing the sexual abuse, Ashley's behavior became such a concern that Anderson admitted her to Belmont Pines Hospital in October for several days. In addition to the above problems, Ashley began to ask alarming questions about the Andersons' baby daughter (Ashley's stepsister, Patience), e.g., "If we put [the baby] on the countertop, if she fell off, would it kill her?"
 {¶ 9} In December, 2001, appellant received a court order for supervised therapeutic visits requiring the guardian ad litem to coordinate supervised companionship between appellant and Ashley in conjunction with Ashley's counselors.[4] Pursuant to this order, near Christmas, 2001, appellant had her first physical visit with Ashley since she relinquished custody in September, 2000. The visit was therapeutic in nature and occurred in the presence of the girls' former therapist. Also present were appellant's counsel, Anderson, and Anderson's wife. Although appellant and Megan apparently related well with one another, Ashley did not connect with appellant.
 {¶ 10} After the December 2001 visit, Ashley's negative behavior increased. According to Anderson, she was highly defiant: she would not do what was asked of her and she refused to do school work; Ashley also began to soil herself and refuse to bathe. Further, if she was put in a "time out" or otherwise punished, Ashley would make herself vomit.
 {¶ 11} In March, 2002, as a result of her unmanageable behavior, Anderson took Ashley to Youth Serves. Ashley's counselor, Shannon Rozycki, began working with the child in April of 2002. Upon her admission, Ashley was diagnosed with post traumatic stress disorder, depression, and ADHD. According to Rozycki, Ashley spoke and still speaks negatively about appellant and does not desire to see or communicate with her. Rozycki testified that Ashley refers to appellant as "Belinda" rather than "mom" and only recently permitted Rozycki to speak about appellant in their therapy sessions. According to Rozycki, Ashley believes that the sexual abuse was a result of appellant's neglect; specifically, Ashley believes her mother did not notice what was happening because she was not "there" for her and her sister. Rozycki testified that although appellant wishes to visit Ashley in person, Ashley would be extremely distressed by any such encounters. In Rozycki's view, any visitation, at this point, without deliberate preparation would be extremely counter-productive to Ashley's progress.
 {¶ 12} Ashley currently resides in the Junior's Unit at CSB. The Junior's Unit is a treatment center for children with behavior problems who have a treatment plan but cannot function in a family setting. Ashley's treatment program is geared at behavioral modification. The goals involve diminishing problem areas via awarding good behavior thereby directing her conduct toward positive acceptable behaviors. The testimony of Rozycki and Melissa Alvarez, Ashley's caseworker, indicate that Ashley's therapeutic goals can be reached only through a structured environment where routine is essential. Thus, stability and regularity in her day to day activities is a necessity.
 {¶ 13} Testimony indicated that Ashley is not currently fit for placement in a home setting. She is a high maintenance child requiring a great deal of attention. Even if Ashley is ultimately amenable to treatment and able to bond with a family, her counselor indicated she would be best served in a family with no children or a family where the children are significantly older. Such an arrangement would provide her with optimum attention and care as well as avoid past problems involving Ashley's propensity for sexual behavior with peers and those younger than her.
 {¶ 14} With the above information in mind, appellant was a party to a caseplan designed to assist her in establishing a relationship with Ashley. The caseplan recommended that appellant demonstrate increased parenting skills and an ability to provide for basic needs. She would need to develop an ability to communicate with Ashley in a positive manner without causing disruption in her life. Further, the caseplan recommended that appellant "* * * receive a psychological evaluation and a parenting assessment at an approved agency and follow all recommendations." Appellant was to attend and complete parenting education at an approved facility and cooperate with CSB and other treatment providers. The caseplan also recommended that appellant complete a drug and alcohol assessment at an approved agency. With respect to the agency's approval process, the caseplan states that "[t]he caseworker will provide casework counseling and case management services. The caseworker will make any necessary referrals to outside agencies."
 {¶ 15} In spite of the caseplan and the December 2001 visitation order, appellant has made intermittent requests to visit Ashley when she is in Warren, Ohio, for court hearings. Such requests are inconsistent with the treatment plan and, according to Rozycki, granting any such request would be detrimental to Ashley's progress.
 {¶ 16} With respect to other features of the caseplan, appellant obtained parenting education, a drug and alcohol evaluation, and a "psych-social" evaluation[5] while in Nevada. Notwithstanding her efforts, however, appellant failed to receive agency approval for these assessments. Moreover, in January, 2003, appellant requested a home study for placement of Ashley in Nevada; the home study was granted and commenced. However, before the home study could be completed, appellant moved back to Connecticut for ostensible financial reasons.
 {¶ 17} The record indicates that appellant has had six different addresses since 1997 and is currently living in a mobile home camper on property owned by a relative. Although appellant has attempted to keep some form of contact with Ashley via letters, phone calls, and sending gifts, Ashley has continuously refused appellant's gestures. Further, any attempt to seek visitation with Ashley has been denied due to appellant's failure to follow the proper channels for such contact set forth in her caseplan. Because of Ashley's negative reactions to appellant's efforts as well as appellant's repeated failure to follow the caseplan, professional recommendations, and the court's order, appellant's visitation privileges were suspended on September 30, 2002.
 {¶ 18} Due to Ashley's various and severe emotional and behavioral problems, Anderson voluntarily relinquished custody of Ashley to CSB. On January 17, 2003, CSB filed a motion for permanent custody of Ashley. The matter was scheduled for trial on March 4, 2003. The permanent custody trial commenced accordingly. After several days of testimony, the permanent custody trial was completed on September 19, 2003. On October 9, 2003, the magistrate issued his decision recommending that permanent custody of Ashley be granted to CSB.
 {¶ 19} Appellant filed objections to the magistrate's decision on October 23, 2003 requesting additional time to obtain the transcript and to supplement her objections. The trial court expanded the time so appellant could supplement her objections: Initially to December 1, 2003, then to January 20, 2004, and finally to February 27, 2004. On April 22, 2004, the trial court issued an opinion overruling appellant's objections to the magistrate's decision and approved the decision granting permanent custody to CSB. Appellant now appeals.
 {¶ 20} Appellant assigns one error for our review:
 {¶ 21} "The trial court erred to the prejudice of appellant in overruling appellant's objections to the magistrate's decision and adopting the magistrate's decision as the opinion and judgment of the court."
 {¶ 22} The termination of parental rights is an alternative of last resort, but is permissible when necessary for the welfare of the child. In re Wise (1994), 96 Ohio App.3d 619, 624. Before a juvenile court can terminate parental rights and award permanent custody of a child to a proper moving agency, it must find, by clear and convincing evidence, both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least twelve of the past twenty-two months, or cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the child's best interests based upon an analysis of R.C. 2151.414(D). See R.C.2151.414(B)(1) and (2).
 {¶ 23} Clear and convincing evidence is more than a mere preponderance of evidence. Instead, it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. In reHolcomb (1985), 18 Ohio St.3d 361, 368. An appellate court will not reverse a trial court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence. In the matter of:Litz, 11th Dist. No. 2001-G-2367, 2001-Ohio-8903, at 13.
 {¶ 24} Initially, we must note that the magistrate, in his decision, went beyond the basic statutory requirements set forth above. As just discussed, a court may grant permanent custody to an agency where it finds, by clear and convincing evidence, thatany of the four situations set forth in R.C. 2151.414(B)(1) applicable and such a decision is in the child's best interest. In the instant case, the trial court found three of the four situations set forth in R.C. 2151.414(B) applicable. This bears mention as the current appeal challenges the courts adoption of the magistrate's findings only with respect to two of these three findings. Thus, even were we to sustain appellant's assignment of error, her challenge would not necessarily merit a reversal to the extent that she failed to object to and appeal the other facets of the decision.[6] However, we shall return to this point after assessing the merit of appellant's assigned error.
 {¶ 25} Appellant contends that a juvenile court inappropriately terminated her parental rights because the evidence did not support its finding that Ashley could not be placed with her within a reasonable time or should not be placed with her under R.C. 2151.414(E). Appellant reduces her general argument into four parts, each of which addresses a specific objection relating to the magistrate's findings. We shall address each particular issue in turn. First, appellant contends that the trial court erred in adopting the magistrate's finding that she abandoned[7] Ashley pursuant to R.C. 2151.414(E)(1). We agree.
 {¶ 26} In his decision, the magistrate stated:
 {¶ 27} "Mother shipped both Ashley and her younger sister to Ohio in September 2000, giving their father less than a week's notice to come and remove them from her care in Connecticut. She new that Ashley had special problems, but did little to address the issues. Instead, she moved to Nevada, and led her life free of their problems. Only after TCCSB filed a motion for permanent custody did she request to become involved.
 {¶ 28} "From September 2000 to March 2002, mother only physically visited twice. After the child was in care, she did not request a visit until late 2002 or early 2003.
 {¶ 29} "Ashley needed the involvement of her mother in counseling with her. Her absence further hurt Ashley."
 {¶ 30} The trial court accepted and adopted these findings.
 {¶ 31} In our view, the above assessment is misplaced with respect to a finding of abandonment. R.C. 2151.011(C) states:
 {¶ 32} "[A] child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."
 {¶ 33} Under the circumstances, although appellant only physically visited Ashley twice between September 2000 and March 2002, the record reflects that she still contacted or attempted to make contact with the child throughout this period. To wit, testimony indicated that appellant called Ashley once a week from September 2000 through April 2001. Although the frequency of calls diminished to approximately once a month from May 2001 through October 2001, appellant still had monthly contact with Ashley. In December, 2001, appellant and Ashley physically met in the presence of Ashley's therapist, et al. Evidence was also presented that appellant sought visitation with Ashley in January 2002, February 2002, and March 2002, but was denied each time. Moreover, appellant presented evidence that she attempted to maintain contact with Ashley either via telephone or mail subsequent to her admission at the Junior's Unit.
 {¶ 34} The evidence demonstrates that CSB was not entitled to a presumption of abandonment. At no point in the period referenced by the magistrate, i.e., September 2000 through March 2002, did appellant fail to make contact or attempt to make contact with Ashley. Moreover, despite her failure to strictly follow the December 2001 visitation order requiring appellant to contact the guardian ad litem to coordinate supervised companionship with Ashley and her therapist, appellant made regular attempts to contact Ashley. Therefore, we hold that the magistrate's finding that appellant abandoned Ashley is not supported by clear and convincing evidence. Under the circumstances, we do not see how appellant abandoned Ashley and the lower court should have sustained appellant's objection in this respect.
 {¶ 35} Appellant next disputes the court's adoption of the magistrate's finding pursuant to R.C. 2151.414(E)(1). Namely, appellant challenges the magistrate's finding that she failed to substantially remedy the conditions causing Ashley to be placed outside her home.
 {¶ 36} We start by noting that the condition causing Ashley to be removed from her home in Connecticut was appellant's voluntary relinquishment of custody to Anderson. However, the main reason why appellant does not currently have visitation with Ashley is due to her failure to comply with her caseplan as well as other recommendations of CSB and/or Ashley's care providers.
 {¶ 37} Strictly speaking, the record clearly and convincingly supports the magistrate's findings with respect to appellant's failure to comply with her caseplan. The caseplan required appellant to maintain stable housing, engage in counseling on a regular basis, complete an interstate placement, pay child support, obtain a psychological evaluation, find services to meet Ashley's therapeutic needs in the event she were granted custody, have a drug and alcohol assessment, and engage in a minimum once a week therapeutic session towards the end of visitation with Ashley.
 {¶ 38} Under the circumstances, appellant has failed to establish stable housing. Appellant admitted to living in three different states in the past several years and moving some eight times since 1997. Currently, appellant and her husband live in a mobile home camper on a relative's property in Connecticut. Such evidence is sufficient to support the magistrate's conclusions that appellant has not established a stable record of housing.
 {¶ 39} Appellant provided no evidence that she engaged in her own independent counseling to prepare her for future joint counseling with Ashley. Nor has appellant completed an interstate home study or placement analysis. Further, appellant admitted to having some $4000 in child support arrearages.
 {¶ 40} Although appellant testified to having a drug and alcohol assessment done, she did not obtain CSB's approval for the evaluation. The same is true regarding the caseplan's recommendation for a psychological evaluation. While in Nevada, appellant obtained an unapproved "psych-social" assessment from a social worker. However, the caseplan required an approved, psychological evaluation.
 {¶ 41} The caseplan stated that Ashley was in need of a safe, secure, permanent home. As indicated supra, the evidence shows that appellant has no residential stability. The evidence demonstrates that Ashley was extremely damaged by her sexual abuse and requires substantially more control, counseling, and attention than a child of average adjustment. Appellant has offered no structured framework as to how she might accommodate Ashley's specific therapeutic needs were Ashley to be placed with appellant. This problem is amplified by appellant's inability to conform to the kind of therapeutic visitation required to re-establish a relationship with Ashley. Appellant has failed to directly contact Ashley's counselor and admitted, at trial, that she would be completely unable and unwilling to participate in therapeutic visitation insofar as she could not travel to Ohio on a weekly or even a monthly basis. In essence, appellant has refused to follow the recommended therapeutic visitation and testified that, unless such recommendations are modified to suit her needs, she was unwilling to follow the recommendations in the future.
 {¶ 42} The foregoing evidence was established at trial, and therefore, we hold that the magistrate's findings with respect to appellant's failure to follow the caseplan are supported by clear and convincing evidence. Thus, the lower court did not err in adopting the magistrate's findings in this respect.
 {¶ 43} Appellant next objects to the finding the magistrate made pursuant to R.C. 2151.414(E)(4). Specifically, the magistrate found that appellant has demonstrated a lack of commitment towards Ashley by failing to regularly support, visit, or communicate with the child or has demonstrated an unwillingness to provide an adequate, permanent, home for Ashley.
 {¶ 44} It is uncontroverted the appellant has extant child support arrearages totaling some $4000. Moreover, appellant's unstable living situation demonstrates that she is unable to establish a permanent home. The record indicates and appellant admitted that her inveterate pattern of residential change is based upon her dependence on family members for assistance, i.e., when one family member can no longer assist her and her husband, she seeks out another relative who is willing to so provide. The fact that appellant and her husband are currently living in a mobile home camper indicates that their living situation will remain in a state of flux. For these reasons and those set forth above, appellant has not established she can set up a permanent home for Ashley. The magistrate's findings are supported by clear and convincing evidence and the court did not err in adopting them in this respect.
 {¶ 45} Finally, appellant objects to the court's adoption of the magistrate's finding based upon R.C. 2151.414(E)(14), viz., that appellant is unwilling to provide clothing, shelter, and other basic necessities for Ashley or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
 {¶ 46} In support of its finding, the trial court found that in "* * * send[ing Ashley], and the problem out of State," appellant failed to provide food, clothing, shelter, or other basic needs. The magistrate's finding specifically addresses whether appellant is unwilling to provide for Ashley's necessities, i.e., the finding deals with appellant's "present willingness." However, the court discusses only appellant's past conduct in relation to her surrender of custody to Anderson in September 2000. These past acts do not truly indicate whether appellant is willing or unwilling to provide necessitiespresently. Thus, in this respect, we find the court's finding irrelevant.
 {¶ 47} However, the court correctly notes that appellant has failed to prevent Ashley from suffering emotional or mental neglect. To wit, testimony indicated that appellant has had the time and ability to return to Ohio, get a job, and engage in counseling towards the end of re-establishing her relationship with Ashley. According to the record, therapeutic visitation was the only way in which appellant could have reconnected with Ashley without further upsetting or damaging the child emotionally. Appellant has summarily failed to interact or attempt to interact with Ashley in this fashion. Further, at trial appellant claimed that she could not engage in the regular recommended therapeutic visitation and would be unwilling to move to Ohio to do so because she has no family and no one to help her in this state. In our view, the magistrate's finding that appellant's refusal to engage in the recommended therapeutic visitation illustrates she is unwilling to prevent Ashley from suffering emotional or mental neglect. Thus, the court did not err in adopting the magistrate's findings, in this respect, as they are supported by clear and convincing evidence.
CONCLUSION
 {¶ 48} Pursuant to the above analysis we hold that the magistrate's finding regarding the issue of abandonment was not supported by clear and convincing evidence. In this respect, the trial court inappropriately adopted the magistrate's finding. However, pursuant to R.C. 2151.414(E), the court may determine that Ashley could not be placed with appellant within a reasonable time or should not be so placed by finding one ormore of the conditions enumerated in R.C. 2151.414(E)(1) through (16). Here the court found three conditions which were supported by clear and convincing evidence. Therefore, the court properly adopted the magistrate's findings with respect to those conditions enumerated under R.C. 2151.414(E)(1), (4), and (14). For the foregoing reasons, appellant's sole assignment of error lacks merit.
 {¶ 49} Although appellant does not argue the issues, we shall nevertheless point out that, in addition to making adequate findings under R.C. 2151.414(E), the magistrate's findings regarding R.C. 2151.414(B) and (D), and the trial court's adoption thereof, were also sufficient to support its decision granting permanent custody of Ashley to CSB. Specifically, the court properly adopted the magistrate's findings that Ashley had been in the temporary custody of CSB for twelve or more months of a consecutive twenty-two month period. See, R.C.2151.414(B)(1)(d). Thus, the trial court met the first prong of the test governing proceedings involving termination of parental rights.
 {¶ 50} With respect to the child's best interests, the magistrate made findings pursuant to R.C. 2151.414(D)(1) though (4), all of which were supported by clear and convincing evidence. Thus, the trial court did not err in adopting the magistrate's findings regarding the Ashley's best interests.
 {¶ 51} In sum, the magistrate properly found that Ashley could not be placed with appellant within a reasonable time or should not be placed with appellant at all. Further, the magistrate properly found the existence of one of the four factors listed in R.C. 2151.414(B)(1). Finally, the magistrate considered the relevant factors set forth under R.C. 2151.414(D) to determine whether granting permanent custody to CSB was in Ashley's best interests. Therefore, excluding the trial court's adoption of the magistrate's abandonment analysis, the magistrate's conclusion that Ashley's best interests could only be served by granting permanent custody to CSB is supported by clear and convincing evidence.
 {¶ 52} For the foregoing reasons, appellant's sole assignment of error is without merit and the judgment of the Trumbull County Court of Common Pleas, Juvenile Division, is hereby affirmed.
O'Neill, J., Grendell, J., concur.
[1] Anderson testified that after he retrieved his daughters, he stopped at the Connecticut State Trooper's barracks to notify the authorities that he had taken legitimate custody of the children from appellant. The troopers checked Children's Services to determine whether the agency had a file on either appellant or the girls. They found nothing.
[2] Appellant explained that the house was in disarray because she and her new husband, Scott Sankow, were in the process of moving pursuant to their eviction.
[3] Scott Sankow testified that the children contracted lice from their stepbrother and stepsister after they returned from a visit with their father (neither Anderson nor Sankow) in North Carolina. Specifically, Mr. Sankow testified that Ashley and Megan contracted lice from the other two children and, in spite of the Sankow's best efforts to eliminate the problem, whenever the girls' stepsiblings returned from North Carolina, they would be infected with lice.
[4] At trial, Shannon Rozycki, Ashley's counselor testified that, given Ashley's fragile emotional state, "therapeutic visitation" would, at the time of the hearing, entail weekly meetings between appellant and Rozycki toward the end of re-establishing a relationship between appellant and Ashley. Specifically, Rozycki would need to meet with appellant and discuss how she would be "presenting herself and certain things that would not be beneficial to say to [Ashley]." A precondition for appellant's visitation was contacting the guardian ad litem or the counselor. Rozycki testified that she had never personally spoken with appellant and she was contacted for a therapeutic visitation only once, in January 2003, by appellant's counsel.
[5] The court determined that the "psych-social" evaluation did not meet the substantive requirements of the caseplan because it was conducted by a social worker rather than a psychiatrist or psychologist.
[6] Namely, appellant does not challenge the court's finding under R.C. 2151.414(B)(1)(d), i.e., that Ashley has been in the temporary custody of CSB for twelve or more months out of a twenty-two month period. Moreover, appellant does not explicitly address the court's determination that the granting of permanent custody to CSB is in Ashley's best interests. Because these findings, standing alone, may justify the court's termination of appellant's parental rights, appellant's appeal is, in effect, under argued.
[7] The trial court additionally found, under R.C.2151.414(B)(1)(b) that Ashley was abandoned by her mother; we reject this finding for the same reasons we reject the court's R.C. 2151.414(E) finding, see, infra.