OPINION *Page 2 
{¶ 1} Plaintiff-Appellant, Patricia A. Huff, appeals the judgment of the Hancock County Court of Common Pleas, Juvenile Division, granting custody of her minor grandson, Matthew Carson, to his father, Defendant-Appellee, John H. Carson, Jr. On appeal, Patricia argues that the trial court abused its discretion when it awarded John custody of Matthew. Based upon the following, we affirm the judgment of the trial court.
 {¶ 2} John and Loretta Carson were married in June 1989, and had one child, Matthew, born February 1, 1991. Patricia is Matthew's maternal grandmother.
 {¶ 3} In June 2000, Loretta became seriously ill and was taken to a hospital in Cleveland, Ohio. John took Matthew to Patricia's home in Findlay while he stayed with Loretta in the hospital.
 {¶ 4} In August 2000, Loretta was released from the hospital and she and Matthew moved into Patricia's home.
 {¶ 5} In April 2004, John filed for divorce from Loretta and obtained court ordered visitation with Matthew.
 {¶ 6} In January 2005, Loretta died. Subsequently, the divorce action against Loretta was dismissed as moot.
 {¶ 7} In April 2005, Patricia moved the court for temporary custody and permanent legal custody of Matthew and an injunction enjoining John from removing Matthew from her possession. Subsequently, the court granted Patricia's motion for *Page 3 
temporary custody of Matthew and the injunction. Subsequently, John moved the court for an order granting him temporary and permanent custody of Matthew.
 {¶ 8} In August 2005, John renewed his motion for temporary custody of Matthew.
 {¶ 9} In September 2005, the trial court sua sponte appointed a Guardian ad Litem for Matthew. Subsequently, the trial court ordered that John have visitation with Matthew.
 {¶ 10} In May 2006, the trial court modified the visitation plan, granting John additional visitation time with Matthew. Further, the court ordered John to pay Patricia the social security benefits he was receiving on Matthew's behalf.
 {¶ 11} In September 2006, the trial court again modified the visitation plan pursuant to mutual agreement of the parties so that John's additional visitation time with Matthew would be exercised on the same weekday every week.
 {¶ 12} In October 2006, John moved the court to find Patricia in contempt for willfully causing interference with his visitation rights.
 {¶ 13} In January 2007, the trial court conducted a hearing on Patricia's motion for permanent custody, John's motion for permanent custody, and John's motion for contempt, at which the following testimony was heard and facts adduced.
 {¶ 14} John testified that in June 2000, Loretta had become ill and had required hospitalization; that he had taken Matthew to Patricia's house while Loretta was *Page 4 
hospitalized because it was an emergency; that Matthew had resided with Patricia and Loretta until Loretta's death in January 2005; that, during the summer of 2000, he had worked part time and spent the rest of the day and most weekends in the hospital with Loretta; that he had left Matthew with Patricia because he could not take care of him while staying at the hospital with Loretta; that his physical contact with Matthew had been intermittent during this time period, but that he had called Matthew on the phone; that, when Loretta's condition improved, she had moved in with Patricia and Matthew because Patricia could provide her with constant care; that, during this time period, marital difficulties had increased between him and Loretta and they had attempted to reconcile through counseling; that, during this time period, "there were a number of occasions where [he] did things with [Matthew] on Saturdays" such as take him to the zoo, COSI, or the park, but there had been no regular overnight visitation (hearing tr., p. 17); that it was possible that he had no overnight visits with Matthew in 2002; that he had at least one overnight visit with Matthew in 2003; that he had not had many overnight visits with Matthew in 2004; that he had tried to spend more time with Matthew, but Loretta had often made excuses as to why he could not; and, that he had not tried to force visitation because he "didn't want to be hostile because [he] was trying to reconcile with [Loretta]." (Hearing Tr., p. 18).
 {¶ 15} Further, John testified that from February 2002 until November 2002, and from March 2003 until October 2003, his career as a statistical scientist had required him *Page 5 
to stay in Washington D.C. and New Jersey, respectively, where he had worked on a team effectuating recovery from anthrax attacks; that he had worked eighty to one-hundred hours per week during these time periods; that, due to his work schedule, he had not been able to travel to Findlay often; that he visited Matthew every time he traveled home, but "the time [he] spent with [Matthew] was very limited because [Loretta] was very disagreeable to [it]" (hearing tr., p. 157); that he contacted Matthew by telephone during these time periods; that, while he was living in Washington, Matthew had taken a trip there with Loretta and Patricia, but Loretta had refused to permit him to see Matthew; that he filed for divorce from Loretta in 2004 and subsequently obtained court ordered visitation with Matthew; and, that, shortly after Loretta's death, he attempted to remove Matthew from Patricia's home, but she prevented him.
 {¶ 16} Concerning financial support, John testified that Patricia had solely supported Matthew from January 2005 until May 2006; that he had not offered to pay Patricia support money because "[he] was not willing to pay her to try to take [Matthew] away from [him]" (hearing tr., p. 25); that he had paid for some of Matthew's music lessons before Loretta's death, but had not paid for any music lessons after her death; that he had been receiving social security benefits on behalf of Matthew since 2000, with which he had started a college account for Matthew that contained over $9,000; that he had never paid the social security benefits to Patricia until ordered to do so in 2006; that *Page 6 
he had not given Matthew school lunch money; and, that he had provided Matthew with food and drinks during his visitation.
 {¶ 17} Patricia testified that, during the summer of 2000 when Loretta was in the hospital, John had returned to Findlay on weekends and had the opportunity to take Matthew, but would "[c]ome over to see [Matthew] for an hour or so and then he would go home because he was too tired" (hearing tr., p. 51); that John had no regular visitations and overnights with Matthew from June 2000 until Loretta's death in January 2005; that there had been weeks when there was no contact between John and Matthew; that, when she, Loretta, and Matthew had visited Washington D.C., Loretta had asked John to come out and see Matthew, but "he said he was working and he didn't have time" (hearing tr., p. 187); that she never sabotaged the relationship between John and Matthew, but attempted to encourage it; and, that "[John] says that he calls and calls and he doesn't get any answer * * * [and that she has] caller ID and * * * if [she is] in the garage or outside or someplace and Matt sees that it's his father, he erases it. And [she doesn't] know that his father called." (Hearing Tr., p. 180).
 {¶ 18} Concerning financial support, Patricia testified that, after Loretta's death, John made no financial contribution to her for Matthew's care; that John did not give Matthew any spending money when he went on a school band trip; that John was the sole family provider during much of Loretta's illness and paid many of her extensive medical expenses; that John did not give Matthew school lunch money; and, that "if [she] hadn't *Page 7 
given him money before he had left [to visit John], the kid wouldn't have eaten from 9 o'clock in the morning until 7 o'clock at night." (Hearing Tr., p. 87).
 {¶ 19} In February 2007, the trial court awarded John permanent custody of Matthew, finding that, from fall 2000 through early 2002, John's overnight visits were sporadic; that, in February 2002, John's employment required him to travel out of state; that John traveled back to Findlay on only a few occasions to visit Matthew in 2002; that, from November 2002, contact between John and Matthew was limited; that John's employment required him to travel out of state from March 2003 until October 2003; that, during this time period, John had contact with Matthew via telephone; that, in the spring of 2006, John attempted to obtain physical custody of Matthew, prompting Patricia to move the court for custody of Matthew; that John was awarded visitation with Matthew in 2005 and 2006 and has been "substantially compliant in exercising court ordered visitation with his son" (February 2007 judgment entry, p. 4); and, "that under the totality of circumstances presented at trial, John Carson made attempts to contact his son and maintain a relationship with his son." (February 2007 Judgment Entry, p. 4). The trial court also concluded that:
 The evidence has not shown that Respondent, John Carson, has abandoned the child, or that he has contractually relinquished custody of Matthew Carson, or that John Carson has become totally incapable of supporting or caring for Matthew Carson.
(February 2007 Judgment Entry, p. 5). *Page 8 
 {¶ 20} It is from this judgment that Patricia appeals, presenting the following assignment of error for our review.
 THE LOWER COURT ABUSED ITS DISCRETION WHEN IT AWARDED CUSTODY OF MATTHEW CARSON TO APPELLEE.
 {¶ 21} In her sole assignment of error, Patricia asserts that the trial court abused its discretion when it awarded John custody of Matthew. Specifically, Patricia argues that John abandoned Matthew, and thus was unfit to have custody of him. We disagree.
 {¶ 22} "`[I]n proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important.'" Reynolds v. Goll (1996), 75 Ohio St.3d 121, 124, quoting Trickey v. Trickey (1952), 158 Ohio St. 9. Therefore, a reviewing court must uphold the trial court's decision in such cases absent an abuse of discretion. Masters v. Masters, 69 Ohio St.3d 83, 85,1994-Ohio-483. An abuse of discretion will only be found where the decision is unreasonable, arbitrary, or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 23} "`This highly deferential standard of review rests on the premise that the trial judge is in the best position to determine the credibility of witnesses because he or she is able to observe their demeanor, gestures and attitude. * * * This is especially true in a child custody case, since there may be much that is evident in the parties' demeanor and attitude that does not translate well to the record.'" Blaker v. Wilhelm, 6th Dist. No. WD-04-003, 2005-Ohio-317, at ¶ 10, quoting In re L.S., 8th Dist. No. 81687, 2003-Ohio-2045, at ¶ 12. *Page 9 
 {¶ 24} "It is well recognized that the right to raise a child is an `essential' and `basic' civil right." In re Hayes (1997),79 Ohio St.3d 46, 48, citing In re Murray (1990), 52 Ohio St.3d 155. Moreover, a parent's right to custody of his child is paramount. Id., citing In rePerales (1977), 52 Ohio St.2d 89, 97. Because a parent has a fundamental liberty interest in the custody of his or her child, this important legal right is "[p]rotected by law and, thus, comes within the purview of a `substantial right'[.] * * *" In re Murray, 52 Ohio St.3d at 157. "Therefore, parents `must be afforded every procedural and substantive protection the law allows.'" In re Hayes, 79 Ohio St.3d at 48, quotingIn re Smith (1991), 77 Ohio App.3d 1.
 {¶ 25} Further, it is well settled that in custody disputes between parents and
nonparents brought under 2151.23(A)(2):
 "[p]arents may be denied custody only if a preponderance of the evidence indicates abandonment, contractual relinquishment of custody, total inability to provide care or support, or that the parent is otherwise unsuitable that is, that an award of custody would be detrimental to the child."
In re Perales, 52 Ohio St.2d at 98, citing Clark v. Bayer (1877),32 Ohio St. 299; see also In re Hockstok, 98 Ohio St.3d 238,2002-Ohio-7208, ¶ 17. Thus, if the court concludes that the conduct of the parent constitutes abandonment, the parent may be adjudged unsuitable and the state may infringe upon the fundamental parental liberty interest of child custody. In re Hockstok, 2002-Ohio-7208, at ¶ 17. In re Masters, (1956), 165 Ohio St. 503, 505-506, defined `abandon' as relinquishment "with the intent of never again *Page 10 
resuming or claiming one's rights or interests in." See also In reCustody of CE., 2nd Dist. No. 2005-CA-11, 2005-Ohio-5913, ¶ 12.
 {¶ 26} Regarding abandonment, courts have found a child to be abandoned where the parent did not visit or attempt to communicate with the child for a period in excess of ninety days, In re BaileyChildren, 5th Dist. No. 2004 CA 00386, 2005-Ohio-2981; where the child was in custody of children's services for two years and the parent did not visit the child for three months, visited sporadically thereafter, and made no phone calls or other attempts to communicate, In reFennell, 4th Dist. No. 02CA17, 2002 Ohio 6151; and, where the parent placed the child in his grandmother's care and did not attempt to visit or communicate with the child for seven months, In re Beireis, 12th Dist. No. CA2003-01-001, 2004-Ohio-1506. Likewise, In re Anderson, 11th Dist. No. 2004-T-0059, 2004-Ohio-5298, found that a child is not abandoned where the parent physically visited the child only twice in a one year and seven month period, but attempted more visitation and contacted the child by telephone.
 {¶ 27} Here, Patricia asserts that John abandoned Matthew and was an unsuitable parent because he had little contact with Matthew during the four and one-half years between Loretta's illness and her death; because there were weeks when he did not talk to Matthew; because there were years when Matthew had no overnight visits with him; because from June 2000 until January 2005, he had ample opportunities to be involved in Matthew's life but chose not to; and, because he provided little if any financial support *Page 11 
for Matthew. In doing so, Patricia relies upon Reynolds, supra, which held that a child was abandoned where the father left the child with a co-worker in order to care for his sick wife. For a year and one-half, during his wife's illness, he saw the child only three times. For three years after his wife's death, he only saw the child five times and never called or made other contact with the child.
 {¶ 28} However, Reynolds is distinguishable from the case sub judice because John saw Matthew more than eight times during the four and one-half year period and was continuously in contact with him via telephone. Further, although Patricia emphasizes that Matthew resided with her from June 2000 until January 2005, Loretta was also living with her for most of this period and John requested and obtained court ordered visitation with Matthew shortly after he initiated divorce proceedings and attempted to remove Matthew from Patricia's home shortly after Loretta's death. While Patricia points to John's intermittent contact with Matthew as proof of abandonment, the evidence indicated that extenuating circumstances existed which prevented John from seeing Matthew on a consistent basis, including that Loretta had a serious illness and had been hospitalized out of town for a long period; that John's employment had required him to work extensive hours out of state for two long periods; and, that Loretta, with whom he was experiencing marital difficulties, had prevented him from seeing Matthew.
 {¶ 29} Moreover, testimony was presented that, although John had few overnight visits with Matthew, that they had some overnight visits and had gone on weekend *Page 12 
outings; that John had visited Matthew whenever he was able to return home from his work out of state; that John had regularly been in contact with Matthew via telephone; that John had further attempted to contact Matthew by telephone, but that Matthew had sometimes erased the messages; that John had started a college account for Matthew with his social security payments that contained over $9,000; that John had obtained court ordered visitation with Matthew soon after he initiated his divorce and had sought custody several months after Loretta's death; and, that John did not pay Patricia for Matthew's care for the one-year period after Loretta's death because he felt that Patricia was keeping Matthew from him, not because he wished to forgo his duties to his child. After reviewing the record, we find that the preponderance of the evidence demonstrated that John's conduct did not evince a settled purpose to forego all parental duties and relinquish all parental claims to Matthew with the intent of never again resuming them.
 {¶ 30} Additionally, we note that, although some of Patricia's testimony conflicts with John's testimony, "`the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact.'" State v. Shafer, 3d Dist. No. 6-05-15,2006-Ohio-4189, ¶ 28, quoting State v. Awan (1986), 22 Ohio St.3d 120. Therefore, the credibility of each party was an issue for the trier of fact. Clearly, the trial court chose to believe John's testimony. Thus, we will not second guess the conclusion of the trial *Page 13 
court. Therefore, we cannot find that the trial court abused its discretion in awarding John custody of Matthew.
 {¶ 31} Accordingly, Patricia's assignment of error is overruled.
 {¶ 32} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment affirmed.
 SHAW and WILLIAMOWSKI, JJ., concur. *Page 1