[Cite as *Hewitt v. Hewitt*, 2009-Ohio-6525.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### UNION COUNTY

PAUL HEWITT,

    PLAINTIFF-APPELLANT,

    -and-                          CASE NO.  14-08-48

TERRI HEWITT,

    PLAINTIFF-APPELLEE,

    v.                                **O P I N I O N**

MINDY M. HEWITT,

    DEFENDANT-APPELLEE.

Appeal from Union County Common Pleas Court,
Juvenile Division
Trial Court No. 20440077

Judgment Affirmed

Date of Decision:    December 14, 2009

APPEARANCES:

    *Rick Rodger*  for Appellant

    *Mindy M. Hewitt,* Appellee

Case No. 14-08-48

**ROGERS, J.**

{¶1} Plaintiff-Appellant, Paul Hewitt[1], appeals the judgment of the Court of Common Pleas of Union County, Juvenile Division, overruling his objections and adopting the magistrate's decision granting Defendant-Appellee, Mindy Hewitt's[2], motion for reallocation of parental rights and responsibilities, and granting Mindy custody of her daughter, Claudia Hewitt. On appeal, Paul argues that the trial court erred in adopting the magistrate's decision and in granting Mindy custody of Claudia because the evidence did not support a finding that a change of circumstances had occurred; because the trial court did not make a finding that the change of circumstances had a material effect on Claudia; and, because the magistrate failed to articulate evidence on the best interest factors of R.C. 3109.04(F)(1) to enable the trial court to conduct an independent review. Additionally, Paul argues that the trial court erred in considering the best interest factors of R.C. 3109.04(F)(1) when it concluded that Mindy was more likely to honor and facilitate court-approved parenting time and visitation rights under R.C. 3109.04(F)(1)(f), based on a finding unsupported by the evidence that he and Terri failed to comply with the magistrate's order granting Mindy parenting time. Based on the following, we affirm the judgment of the trial court.

---

[1] Although both Paul Hewitt and his wife, Terri, (collectively referred to as the "Hewitts") were granted custody of Claudia and were plaintiffs in the trial court proceedings, only Paul appealed the trial court's judgment.

{¶2} In October 2004, the Hewitts filed a complaint to determine custody, requesting that they be designated the sole residential parents and legal custodians of Claudia Hewitt. The complaint stated that Claudia had been living with the Hewitts since birth, and that they had been the child's primary caretaker; that Paul was Claudia's maternal grandfather; that Claudia's natural mother and Paul's daughter, Mindy Hewitt, had failed to be involved in Claudia's life; that the identity of Claudia's natural father was unknown; and, that it was in Claudia's best interests that they be granted legal custody.

{¶3} In January 2005, the magistrate issued her decision, pursuant to the agreement of the parties, granting legal and physical custody of Claudia to the Hewitts. The magistrate's decision did not provide for parenting time for Mindy or require her to pay child support. Subsequently, the trial court adopted the magistrate's decision.

{¶4} In February 2008, Mindy filed a motion for reallocation of parental rights and responsibilities, stating that a change of circumstances has occurred since the January 2005 order making it in Claudia's best interests that she be granted custody. Subsequently, Mindy filed a motion for temporary orders, requesting that the trial court grant her parenting time with Claudia during the

---

[2] We note that, since the commencement of the custody proceedings in 2004, Mindy married and changed her last name to Simpson. However, since the trial court proceedings commenced prior to her name change, we will refer to her as Mindy Hewitt.

pendency of her reallocation motion, as the Hewitts were only permitting her to have parenting time once per month.

{¶5} In April 2008, the magistrate issued an order granting Mindy parenting time with Claudia every other Saturday and Sunday from 8:00 a.m. until 7:00 p.m.

{¶6} In May 2008, Mindy filed a motion to expand her parenting time, a motion to appoint a guardian ad litem ("GAL"), and a motion for a restraining order to prevent all parties from discussing the pending custody proceedings with Claudia and to prevent all parties from making demeaning remarks about each other to Claudia. Subsequently, the trial court granted the motion to appoint a GAL, granted the restraining order, and granted the motion to expand Mindy's parenting time, permitting her to exercise parenting on Saturday overnights during weekends in which she was currently exercising parenting time.

{¶7} On July 3, 2008, a hearing was held on the reallocation motion, at which the following testimony was adduced. Paul testified that Claudia was living with him and his wife, Terri, and had lived with them since she was born; that, although he and his wife had custody of Claudia, the custody arrangement was only meant to be temporary; that he wanted Mindy to have custody of Claudia if it was in Claudia's best interest, but that he was presently opposed to Mindy having custody because she could not provide the proper structure in her home, including

providing Claudia adequate help with her homework; that he was afraid Claudia would end up with a baby-sitter if Mindy was granted custody; and, that he thought Claudia would be neglected and unhappy if she lived with Mindy.

{¶8} Paul further testified that three of his other grandchildren and the mother of those children lived in his home; that he had several disabilities resulting from injuries he sustained during the Vietnam War, including diabetes, an irritated sciatic nerve, back problems, and pain in his foot, hip, and leg; that he was also diagnosed with anxiety and depression and took medication for the depression; that, when he and Terri received legal custody of Claudia, he was already diagnosed with some of these medical conditions and was on about six different medications; that he currently takes eleven different medications, including morphine to manage his pain; that he had been on morphine for five years; that he began taking 15 milligrams of morphine per day, and he was now taking 360 milligrams per day; that his health problems had become worse as he aged; and, that, although his health problems prevented him from doing certain things, he was still able to keep up his house, even though it took him longer to do certain tasks than it did before.

{¶9} Paul continued that Claudia was in second grade; that he could not remember the name of the school where she attended; that he had not met with any of her teachers; that he knew her friends but could not remember their names; that

Claudia's favorite subjects in school were reading and art, and she learned to read before she started school; and, that Claudia was not currently involved in any extracurricular activities.

{¶10} Mindy testified that she voluntarily gave custody of Claudia to the Hewitts because she thought it would be the best situation for Claudia due to her own incompetence as a parent at the time; that the plan was to slowly transition Claudia back into her life, but Terri continued to tell her that Claudia was not ready; that, before the court ordered visitation, she was only able to see Claudia about once per month; that, also before the court ordered visitation, she attempted to spend more time with Claudia, including having her stay overnight, but that she would sometimes "freak out" and "want to go home" (hearing tr., pp. 33-34), and the Hewitts would tell her not to force Claudia to stay with her, so she would take Claudia back to their house; and, that, presently, Claudia was able to stay at her house without any problems.

{¶11} Mindy continued that Claudia had changed a lot since the Hewitts were granted custody; that Claudia was more social and cared more about social acceptance; that she had begun asking questions about her body; that Claudia now looked at her as more of a mom and less of a sister; and, that Claudia had questions about religion.

{¶12} Mindy further testified that since the trial court granted custody of Claudia to the Hewitts, she got married; that she was now a much more stable and confident parent; that she currently lived in a three bedroom apartment with her husband James, her five year-old son Sebastian, and her fourteen month-old daughter Leila; that she was currently employed, but that James was unemployed, collecting social security disability for his bi-polar disorder; that James took medication for his bi-polar condition, along with medication for depression and anxiety; that James was convicted of domestic violence in July 2003; that he successfully completed probation and anger management classes that were ordered as a result of the conviction, and he had no further incidents of domestic violence; that she attended church with her husband and children, including Claudia; that Claudia had developed a closer relationship with her step-brother and sister, and with James; that she and James participated in many activities with Claudia and her other children, including going to COSI, the movies, and Galaxy Golf and Games; and, that she took Claudia to see her mother, Claudia's grandmother, when she had parenting time, as that was the only time Claudia was able to see her.

{¶13} Mindy also stated that she volunteered at Claudia's school so she could spend more time with her; that she would like to enroll Claudia in extracurricular activities; that Paul's health had degraded over the last three or four

years; that he no longer had the energy he once had, and he slept a lot; and, that he was not able to have a lot of involvement with Claudia anymore.

**{¶14}** Nathan Pugh, a former minister at the church Mindy and James[3] attended, testified that he had known Mindy and James for around eight years; that they both did a very good job interacting with their children; that Mindy was nurturing, loving, and capable of taking care of her children; that he had counseled James and taught a parenting class that Mindy and James attended; and, that he had been in their home, and it was always well-kept.

**{¶15}** At the close of Mindy's presentation of evidence, the Hewitts moved for the magistrate to overrule Mindy's motion, arguing that she failed to present sufficient evidence that there had been a change of circumstances to warrant a modification of custody. Subsequently, the magistrate overruled the Hewitts' motion, finding that Mindy presented sufficient evidence to establish a change of circumstances, and that the hearing should proceed on to the evidence of the best interest of Claudia.

**{¶16}** Alison Boggs, GAL for Claudia, testified that she made a home visit with both the Hewitts and Mindy; that Mindy's home was well-organized and clean; that Mindy interacted with her children very appropriately; and, that it was in Claudia's best interest that Mindy be granted custody.

---

[3] We note that Pugh refers to James as "Shane" throughout his testimony, which we take to either be a mistake in the transcription of the record, or an alternate name used by James.

{¶17} Furthermore, Boggs filed a GAL report, which stated as follows:

**Meeting with Mindy Simpson**

**I went to Mrs. Simpson's home to meet with her.  * * * The house was clean and organized.**

**\* \* \***

**While we were talking, I was able to watch Mr. and Mrs. Simpson interact with their children.  I did not have the opportunity to see Claudia with them.**

**Mrs. Simpson spoke freely about the circumstances of Claudia staying with her father and step-mother.  * * * Mr. Hewitt always told her that he did not want "custody, custody" of Claudia, and that Claudia would go back to Mrs. Simpson as soon as she was ready to parent.**

**According to Mrs. Simpson this was to take one to two years to transition Claudia into her home, but after one year her parents would only let Mrs. Simpson get Claudia one night per month.**

**When Claudia was eighteen months old, and after Mrs. Simpson met Mr. Simpson, * * * she attempted to take Claudia home, but she would cry so much and throw such fits, Mrs. Simpson thought she was doing the right thing by taking Claudia back to the Hewitts' home.  This happened regularly, thwarting the transition back into the home.**

**Eventually a motion for custody was filed by the Hewitts.  * * * When the court granted custody, there was no visitation order; it was left up to the parties to get a routine set.**

**\* \* \***

**Mrs. Simpson pretty well indicated that she did do her running around until she got baptized.  She and Mr. Simpson attend Marysville Christian Church and the Vineyard Church.  They**

**both talked about the changes that have occurred in their lives.
* * ***

**They recognized early on that they needed help and sought
marriage counseling.  They also participated in a litany of
programs through CCI, the YMCA, and the Vineyard, where
they still have their counseling.  * * * They did this all on their
own, not because anyone said that they had to take them.**

**\* \* \***

**We talked a little about Claudia's biological father, he has not
been around since she was six weeks old.  Mr. Simpson has been
around since she was nine months and Mrs. Hewitt objected to
Claudia calling him 'dad' saying that "he's not her dad."**

**The Hewitts will not permit Mr. Simpson in their home, thereby
forcing Mrs. Simpson to choose between her daughter and her
husband and family.**

**\* \* \***

**[Mrs. Simpson] said that since the custody case has been
reopened she is not allowed at the Hewitt house.  She would love
it if Claudia and Sebastian and Layla could come over to
Grandma and Grandpa's to play and visit.**

**\* \* \***

**Mrs. Simpson is afraid for Claudia to stay [with the Hewitts]
because her father is on all kinds of medication and takes insulin
for his sugar.  She claims he gets dizzy and falls.  She also
expressed concern that Claudia is not disciplined there.  Claudia
tells her that she never gets spanked or put in a time out.
Claudia acts disrespectful to Mr. Simpson.**

**\* \* \***

**In watching her interact with her children, she was very calm
and never raised her voice when they had to be corrected or**

redirected.  She was very appropriate with them while I was there.  I noted that she was very attentive to her children.

* * *

**Meeting with the Hewitts**

* * *

The entire home is one big storage unit, it seems.  Every room has stuff stacked almost from floor to ceiling along the walls.  Some doorways are blocked, like to the basement.  No door that leads to and from the house is blocked, but you can't go anywhere in the home without there being stuff. * * *

Mrs. Hweitt's [sic] son's girlfriend [Jessica] and two children also live in the house.  * * * Mr. Hewitt defended them living there by saying he would not let his grandchildren live on the streets.  The Hewitts anticipate that as soon as Jessica finds a job, she and the children will be moving out.  There appears to be no contemplated time frame for that.

* * *

Mr. Hewitt started the conversation saying that the agreement was Claudia would be integrated slowly back into the house.  His measuring tool is "when she is stable and can take care of [Claudia] properly."  However, that is a very subjective standard. * * *

Mr. Hewitt admitted that he "did not know when or if [Mindy] wouldn't be neglectful.  It is part of her nature."

Many times during the beginning of our conversation, Mr. Hewitt would emphasize that he did not want custody.  It was his hope that if he had Claudia, Mrs. Simpson would straighten up, but instead "she goes and has two more."

Mrs. Hewitt, on the other hand, was very clear when she said, "I wanted custody of her so her mom couldn't come and take her."

-11-

She did not want Claudia to be "drug out." "She has been here for seven years and she is part of the family" is Mrs. Hewitt's attitude.

\* \* \*

The Hewitts reciprocally claim that Mrs. Simpson has no discipline in her home, Sebastian is a terror and breaks things for the sake of breaking things, that Claudia wears the same clothes home that she was sent in, telling them that she slept in her clothes.

Like his father, Sebastian is not welcomed in their home, at least not without Mrs. Simpson there. That attitude can certainly come between spouses and families.

They lingered in the past, especially since the beginning forward. They are skeptical about her involvement with religion, feeling that she is doing this all for show and that it won't last. Her clean home won't last. Nothing will seem to last for them in regard to her, which means, going back the goals they arbitrarily set can never be attained in their minds. Therefore, Claudia would never go back to her mother's. It is really that simple for them.

### Meeting with Claudia

\* \* \*

We talked about staying at her mother's house. Claudia admitted that sometimes when she is there she fells a "little scared." But as we discussed it more, it seems she was really home sick which I think is natural for a child being away from the palce [sic] she knows as home. But she also described that when she is feeling scared her mom rubs her head and hands and she feels better. \* \* \*

Claudia goes to church with her mom and likes it. She does not go to church with her grandparents.

\* \* \*

We talked about her step dad.  She likes him.  She thinks he is funny.  He makes her laugh to cheer her up.

### Conclusion and Recommendation

There is a lot of animosity with these adults.  It seems there is one standard for one family compared to the other family.  Take housekeeping for example.  Comparing the two homes, Mrs. Simpson's home is bright and airy and clean.  The Hewitt home is overly full of stuff: an empty 165 gallon aquarium (and a similar sized one out in the yard that is supposed to be picked up any day now) sitting in the living room chewing up space.  There is just so much more.  \* \* \* And there are a lot of people living in what space is left over.

Projects have been started that cannot be completed because Mr. Hewitt is not physically capable of finishing them.

I don't know if Mrs. Simpson's house keeping will end up like the Hewitts described, but I have to say her house was clean when I arrived.  And I do not believe it was just because I came for the visit.

\* \* \*

Mr. Hewitt explained that his health is not good: he is not dying, but he "got busted up in Viet Nam [sic] and its all coming back."
\* \* \*

Claudia is certainly acclimated into her grandparent's home.  But, she continues to be subjected to change, with the arrival of Jessica and her two children and the eventual departure of her cousins.  So, while she has lived in the same building since she was born, she has had people moving in and out all around her, her mother included.

Each side loves this little girl and it is easy to see why.  However, I do not get the feeling from Claudia that there is anything at

**her mother's house that is so bad that she could not adjust to living there if this Court found there was a change of circumstances to warrant a change of custody. * * ***

**Therefore, if a change of circumstances is found, I believe it is in Claudia's best interest to be placed with her mother and brother and sister and have regular court ordered visitation with the Hewitts.**

(GAL Report, pp. 2-9).

{¶18} Subsequently, the magistrate awarded custody to Mindy, stating the following from the bench:

**\* \* \*  Wishes of the child's parents.  Obviously the mother in this case wants to have custody of this child.  \* \* \* So the court takes that into consideration.  \* \* \* [W]e certainly listened to the Guardian Ad Litem in this case considering the interaction and relationship with the child's parents, siblings, and any other person.  The child's lived with the maternal grandfather and his current wife pretty much since birth.  \* \* \* She has obviously as a result of that [sic], she has an extreme bond with them \* \* \*. The testimony's pretty clear that \* \* \* prior to this court's intervention, a specific parenting time, the interaction between Mindy \* \* \* and the minor child was sketchy at best.  \* \* \* But subsequent to this court's orders, even though it started out a little bit tenuous and there was at least one time, again, unrefuted testimony that the child was upset having to spend the night with the Simpsons, that she's gotten used to that.  \* \* \* She's asking appropriate questions to her mother as a care giver and as an adviser which she may or may not have done in the past.  She's developed \* \* \* a sibling relationship with her brother based upon testimony by Ms. Boggs, with her \* \* \* sister and brother based upon testimony by Miss Hewitt \* \* \*.  She's developed a better relationship with her stepfather since the visitation has started.  \* \* \* I did hear, and I just want to insert this.  Mr. Hewitt, while the testimony was pretty clear to me that his interaction has been decreasing, he's still very involved.  \* \* ***

**It's pretty clear to me that there is an interactive relationship there.**

**\* \* \***

**Mental and physical health of all persons involved.  We heard a lot of testimony about Mr. Hewitt's physical health.  We heard a little bit about his mental health.  We heard \* \* \* some testimony about [James'] mental health.  Folks, considering all those things that everybody's on medication, or at least Mr. Hewitt and Mr. Simpson are on medication. [sic] Mr. Hewitt's unrefuted testimony was even though the morphine has gone up to 360, his personality has not been altered as a result of that, and that everyone who knows him has said that.  \* \* \* Likewise, I presume and its unrefuted that [James] has no mental health problems as long as he's medicated and that he totally understands he always has to be medicated now.**

**\* \* \***

**The parent more likely to honor, facilitate court ordered parenting time, rights to visitation and companionship rights.  I have to tell you I think that's probably Miss Simpson at this point because this original order was set so that there would be some kind of mutual visitation of the parties.  \* \* \* Didn't hear any testimony about child support cause nobody's order [sic] child support right now.  I did hear that Mr. Simpson had been convicted of domestic violence, but that's remote in time at this point.  And the testimony was unrefuted that the likelihood of that reoccurring is substantially lessened based upon his medication and management for his mental health issues.  I'm not going to make any findings that either parties [sic] continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court.  Because the order of the court was so vague with regard to what visitation would like that [sic] I don't think I could make that finding.  But and there was only testimony that Miss Simpson wasn't going to move out of the state, but I didn't hear anything about the Hewitts.  \* \* \* So based upon all that \* \* \* I think the best interest of the child is to grant legal custody to the mother,**

> **Mindy Simpson, at this time. I think it's in the child's best interest to maximize the time with the Hewitts because it has been a very difficult thing in this case to reintegrate the mother in the * * * child's life. What I'm going to do is give the Hewitts every other weekend. Friday at six to Sunday at six. And * * * on the weeks that they don't have the weekend, I'm going to give them Wednesdays.**

(Reallocation Hearing tr., pp. 75-80).

{¶19} On July 10, 2008, the magistrate filed her decision, which provided, in pertinent part:

> **After hearing evidence, testimony, and the arguments of counsel, the Court issues the following:**
>
> **(1) Mr. Hewitt suffers from new maladies and is not interacting with the child as much as he was at the time of the grant of custody to the Hewitts.**
> **(2) The child now has a new sibling, Layla.**
> **(3) The Plaintiffs have allowed very little contact between the Defendant and the child since the award of custody of the child to the Plaintiffs.**
> **(4) Therefore, this Court finds that based upon a totality of the circumstances, and by a preponderance of the evidence, there has been a substantial change of circumstance in the child's life and Plaintiff Paul Hewitt's life.**
> **(5) According to O.R.C. 3109.04, the Court finds that it is [sic] the child's best interests that Defendant be granted custody of the child and that harm likely caused by the change is outweighed by the advantages of a change of custody to Defendant.**

(July 2008 Magistrate's Decision, pp. 1-2).

{¶20} On July 21, 2008, the Hewitts filed objections to the magistrate's decision, arguing, in part, that the magistrate did not have sufficient evidence

which would have permitted her to find a change of circumstances pursuant to R.C. 3109.04; that the magistrate erred when awarding custody to Mindy based upon Paul's alleged illness, as it did not prevent him from interacting with Claudia; and, that the magistrate erred when she made no best interest findings in her decision and no findings as to the harm likely to the minor child should a change of custody occur.

{¶21} In November 2008, the trial court overruled the Hewitts' objections and adopted the magistrate's decision, stating:

> **After an independent review of this case, including the Court's file, and further including listening to the C.D. recording of the hearing, the Court finds the Plaintiffs' Objections to the Magistrate's Decision not well taken, and further modifies said Decision.**
>
> **The Plaintiffs' First Objection states that the Magistrate erred and did not have sufficient evidence presented to her which would permit her to find a change of circumstances pursuant to Ohio Revised Code Section 3109.04.**
>
> **\* \* \***
>
> **\* \* \* Paul Hewitt testified that while he suffered from various disabilities at the time that he and Terri Hewitt were granted custody of Claudia \* \* \*, his disabilities have increased with age and also new problems including diabetes have developed. \* \* \* In addition, the number of drugs he took in January, 2005 has increased from half a dozen to eleven different prescriptions including the morphine. Mr. Hewitt testified that his physical condition has continued to deteriorate and that he is not able to do everything he used to without suffering from considerable pain.**

**In addition, the testimony of Mindy Simpson indicated that Claudia has developed a close relationship with her brother Sebastian and also with her new sister, Layla. * * * This change in the relationship that Claudia has with her brother and sister is significant in Claudia's life.**

**In addition, the Court finds that Paul Hewitt has changed his attitude regarding the relationship that * * * Mindy should have with her daughter, Claudia. Mr. [Hewitt] acknowledged that his custody of Claudia was never supposed to be a permanent situation. * * * Mrs. Simpson however testified that she did want to spend more time with Claudia and asked her father for more visitation. She testified that her father and Mrs. Hewitt advised her that for the good of Claudia she should not have her for additional visitation. * * * The Court finds that Mrs. Simpson's testimony that she wanted a closer relationship with Claudia is supported by her actions of volunteering at Raymond Elementary every Tuesday, which she testified was so that she could see her daughter more often. She further testified that she and Claudia now have a mother daughter relationship; that Claudia has now begun to talk to her about questions that she has about herself, her body, religion, [sic] her other family members. There is no doubt that Mr. Hewitt has taken excellent care of his granddaughter * * *. He has however discouraged the relationship between Claudia and her mother and has ignored the desire and actions taken by his daughter to have a closer relationship with Claudia. This is a change in the circumstances of Mr. Hewitt and Claudia that is significant.**

**\* \* \***

**The Plaintiffs' Third Objection states that the Magistrate was in error when she considered * * * that the Plaintiffs have allowed very little contact between the Defendant and the child. * * ***

**The Court agrees that there was no order for visitation for Mindy Simpson in the January, 2005 Order granting the Plaintiffs custody. The Court disagrees however that the Plaintiffs were during all of the past three years, willing to allow**

**Mrs. Simpson to have more contact with Claudia if she had chosen to do so. * * ***

**In addition, the Court finds that the Magistrate's Order filed on April 4, 2008 did give Mindy Simpson parenting time of every other Saturday and every other Sunday from 8:00A.M. to 7:00P.M. Mrs. Simpson testified that after said order was made, that she asked for visitation but was told by the Plaintiffs that they did not feel that Claudia was ready and visitation did not occur. This testimony was not refuted. The Plaintiffs attempted to control the contact between Claudia and her mother and did not allow the amount of parenting time granted to her by the Magistrate's Order of April 4, 2008.**

**\* \* \***

**The Plaintiffs' Fifth Objection states that the Magistrate erred in not making any best interest findings per the Magistrate's Decision filed July 10, 2008, and that without a transcript, the Plaintiffs' new counsel was unable to determine if evidence had been presented as to the best interests of the child.**

**As stated in the beginning of this Judgment Entry, the Plaintiffs were granted considerable time to obtain a transcript of the audio C.D. of the July 3, 3008 [sic] hearing in order to review the testimony and the Magistrate's findings regarding the child's best interests * * *.**

**\* \* \***

**In reviewing the evidence in this case as to the best interests of Claudia, the Court finds that a modification of this Court's prior Orders is necessary to serve the best interest of the child.**

**O.R.C. 3109.04(F)(1)(a) requires the Court to consider the wishes of the child's parents regarding the child's care. In this case, the mother is asking for custody. * * * Paul and Terri Hewitt want to retain custody of Claudia. The Court finds that both parties wish to have or retain custody of Claudia.**

-19-

\* \* \*

**O.R.C. 3109.04(F)(1)(c) requires the Court to consider the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest. \* \* \* Mr. Hewitt's testimony evidenced his love for and involvement with his granddaughter, and his desire to keep her close to him. \* \* \* Other than testimony that Claudia played with her cousins, there was no significant testimony about closer interaction between Claudia and any of these relatives.**

**Mrs. Simpson's contact with Claudia is not as frequent as Mr. and Mrs. Hewitt's contact. \* \* \* In spite of this obstacle to getting to spend time with her daughter, Mrs. Simpson found other ways to have contact with Claudia by becoming a volunteer at her school. \* \* \* Mrs. Simpson further testified that during the past two years, Claudia has grown a lot closer to her step-father, [James], \* \* \* and that she has a good relationship with her brother Sebastian and her sister, Layla. \* \* \* The Court finds that Claudia has good interaction with the Plaintiffs and with the Defendant, with her step-father, and with her brother and sister, Sebastian and Layla;, [sic] as well as with her grandfather's relatives and her mother's mother's relatives including her maternal grandmother and aunts and cousins.**

**O.R.C. 3109.04(F)(1)(d) requires the Court to consider the child's adjustment to the child's home, school and community. Claudia is well adjusted in her home with Mr. and Mrs. Hewitt. The testimony also showed that Claudia has adjusted to the home of her mother, Mindy Simpson. \* \* \***

**The Court finds that Claudia is comfortable and happy in her home with the Plaintiffs and is also comfortable and happy when she visits the Defendant and her family. The Court further finds that Claudia is well adjusted in her school.**

\* \* \*

**O.R.C. 3109.04(F)(1)(f) requires the Court to consider which parent is more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights. The evidence showed that the Plaintiffs did not permit Mrs. Simpson to exercise the parenting time granted to her by this Court in its April 4, 2008 Magistrate's Order. Further, the testimony of Mr. Hewitt is that he is opposed to Mrs. Simpson taking Claudia because she didn't complete what she was supposed to do, i.e. she has not attempted to spend time with and get to know her daughter during the past three years, demonstrates [sic] his attitude regarding keeping Claudia close to him to the exclusion of her mother. Based on the evidence the Court finds that Mrs. Simpson is more likely to honor and facilitate court-approved parenting time.**

**\* \* \***

**In reviewing the facts in this case as they apply to O.R.C. Section 3109.04(E)(1)(a)(iii), the Court finds that the harm likely to be caused by modifying the Court's prior order which allocated parental rights and responsibilities to Claudia's grandfather and step-grandmother to an order allocating such rights to Claudia's mother is outweighed by the advantages of the change of environment to the child.**

**\* \* \***

**The Court finds that Mindy Simpson has developed a relationship with her daughter; that she is involved in Claudia's schooling; [sic] that in her home, Claudia will have the advantage of living and interacting with her siblings, Sebastian and Layla. The Court further finds that living with her mother, will enable Claudia to have the opportunity to know her relatives on her mother's side of the family as well as her mother's father's relatives. The Court further finds that while living with her mother, Claudia will be able to maintain a close relationship with her grandfather and step grandmother [sic], Mr. and Mrs. Hewitt.**

**\* \* \***

**Based on the Court's findings above, IT IS HEREBY ORDERED that the Plaintiffs' Objections are OVERRULED.**

(Nov. 2008 Judgment Entry, pp. 4-25).

**{¶22}** It is from this judgment that Paul appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ERRED IN ADOPTING THE MAGISTRATE'S DECISION AND FINDING THAT A CHANGE OF CIRCUMSTANCES OCCURRED SUCH THAT IT WAS IN THE BEST INTERESTS OF THE CHILD TO MODIFY THE PRIOR DECREE AND AWARD CUSTODY TO THE APELLEE.**

*Assignment of Error No. II*

**THE TRIAL COURT ERRED WHEN CONSIDERING THE BEST INTEREST FACTORS AS THE TRIAL COURT MISUNDERSTOOD THE TESTIMONY GIVEN BEFORE THE MAGISTRATE AS IT APPLIED TO 3109.04(F)(1)(F).**

*Assignment of Error No. I*

**{¶23}** In his first assignment of error, Paul argues that the trial court erred in adopting the magistrate's decision because the evidence failed to support the magistrate's finding that a change of circumstances occurred in order to warrant a modification of custody; because the trial court did not make a finding that the change of circumstances had a material effect on Claudia; and, because the magistrate's decision failed to articulate evidence on the best interest factors of

-22-

R.C. 3109.04(F)(1) to enable the trial court to conduct an independent review and adopt the decision.

{¶24} Before specifically addressing Paul's assignment of error, we first find it necessary to set forth a broad overview of the law governing custody disputes between parents and non-parents.

*Standard of Review*

{¶25} Decisions concerning the allocation of parental rights and responsibilities pursuant to R.C. 3109.04(E) rest within the sound discretion of the trial court. *Miller v. Miller* (1988), 37 Ohio St.3d 71; *Erwin v. Erwin*, 3d Dist. No. 14-05-45, 2006-Ohio-2661, ¶12. Custody determinations are some of the most difficult and agonizing decisions a trial court must make, and, therefore, an appellate court must grant wide latitude in its consideration of the evidence. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 1997-Ohio-260. Thus, we will not reverse a child custody decision that is supported by a substantial amount of competent, credible evidence absent an abuse of discretion. *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, syllabus.

*Custody Disputes Between Parents and Non-Parents*

{¶26} Jurisdiction in child custody disputes arises under one of two separate statutes, R.C. 3109.04 and R.C. 2151.23. *Smith v. Boyd*, 3d Dist. No. 13-05-49, 2006-Ohio-6931, ¶40, citing *In re S.M.,* 160 Ohio App.3d 794, 2005-Ohio-

2187, ¶8. Child custody dispute jurisdiction is conferred on the domestic relations court pursuant to R.C. 3109.04(A) when the custody proceedings arise out of "any divorce, legal separation, or annulment proceeding and in any proceeding pertaining to the allocation of parental rights and responsibilities for the care of a child * * *." R.C. 3109.04(A). Conversely, R.C. 2151.23(A)(2) vests jurisdiction for custody disputes in the juvenile court for "any child not a ward of another court of this state," which typically encompasses all custody disputes between parents and non-parents. See *In re Brayden James*, 113 Ohio St.3d 420, 2007-Ohio-2335, ¶38 (Lundberg Stratton, J., dissenting); *Huff v. Carson*, 3d Dist. No. 5-07-05, 2007-Ohio-5194, ¶25.

**{¶27}** When jurisdiction for the custody proceeding lies with the domestic relations court, R.C. 3109.04 requires the trial court to conduct a two-part test in order to modify custody. First, the trial court must determine whether a change of circumstances has occurred for the child, the child's residential parent, or either of the parents in a shared parenting decree. Second, if the court finds a change in circumstances, it must then determine whether such a modification would be necessary to serve the best interest of the child, and it must find one of three circumstances listed in the statute to be present. See *Lawrence v. Lawrence,* 3d Dist. No. 1-2000-74, 2001-Ohio-2190. R.C. 3109.04(E) provides, in pertinent part:

-24-

**(E)(1)(a) The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:**

**(i) The residential parent agrees to a change in the residential parent or both parents under a shared parenting decree agree to a change in the designation of residential parent.**

**(ii) The child, with the consent of the residential parent or of both parents under a shared parenting decree, has been integrated into the family of the person seeking to become the residential parent.**

**(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.**

R.C. 3109.04(E)(1)(a)(i)-(iii).

{¶28} Furthermore, R.C. 3109.04(F) provides a list of non-exclusive factors for the trial court to consider in determining the best interest of the child. These factors include:

**(a) The wishes of the child's parents regarding the child's care;**

**(b) If the court has interviewed the child in chambers pursuant to division (B) of this section * * *, the wishes and concerns of the child, as expressed to the court;**

**(c)   The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;**

**(d)   The child's adjustment to the child's home, school, and community;**

**(e)   The mental and physical health of all persons involved in the situation;**

**(f)   The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;**

**(g)   Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;**

**(h)   Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; * * ***

**(i)   Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;**

**(j)   Whether either parent has established a residence, or is planning to establish a residence, outside this state.**

R.C. 3109.04(F)(1)(a)-(j).

{¶29} Although R.C. 3109.04(F) provides a list of factors for the trial court to consider in determining the best interest of the child, there is no requirement that the trial court set out an analysis of each factor in its judgment entry, so long

as the judgment entry is supported by some, competent credible evidence that the best interest of the child was considered. *Bunten v. Bunten* (1998), 126 Ohio App.3d 443, 447, citing *Masitto v. Masitto* (1986), 22 Ohio St.3d 63.

{¶30} Alternatively, when jurisdiction for the custody proceedings is vested in the juvenile court pursuant to R.C. 2151.23(A)(2), the statute does not explicitly provide a test or standard by which the trial court is to determine custody. Instead, R.C. 2151.23(F)(1) states that "[t]he juvenile court shall exercise its jurisdiction in child custody matters in accordance with sections 3109.04 * * * of the Revised Code." As such, this means that any custody modification must follow the two-part test of R.C. 3109.04(E)(1)(a). Furthermore, the Supreme Court of Ohio has developed an additional rule for the trial court to follow in making custody determinations under R.C. 2151.23(A)(2).

{¶31} Underlying both R.C. 3109.04 and R.C. 2151.23 is the principle that parents are imbued with the fundamental right to care for and retain custody of their children. *In re Shaeffer Children* (1993), 85 Ohio App.3d 683, 689, citing *Santosky v. Kramer* (1982), 455 U.S. 745. See, also, *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, ¶16. Additionally, within this fundamental right is the idea that "'the custody, care and nurture of the child [should] reside first in the parents[.]'" *In re Honse Children*, 3d Dist. Nos. 5-08-45, 5-08-46, 5-08-47, 2009-Ohio-1913, ¶5, quoting *Stanley v. Illinois* (1972), 405 U.S. 645, 651.

Accordingly, "'a parent's right to the custody of his or her child has been deemed 'paramount'' when the parent is a suitable person." *Boyd*, 2006-Ohio-6931, at ¶41, quoting *In re Hayes* (1997), 79 Ohio St.3d 46, 48.

{¶32} In order to protect and preserve the natural parents' fundamental right to the custody of their children, the Supreme Court of Ohio has required that, in an R.C. 2151.23(A)(2) custody proceeding between a parent and non-parent, the trial court must make a finding of parental unsuitability before awarding custody to the non-parent, namely that "the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child." *In re Perales* (1977), 52 Ohio St.2d 89, syllabus.

{¶33} The rationale for the additional requirement of a parental unsuitability finding for custody proceedings under R.C. 2151.23(A)(2) is because custody proceedings that arise under R.C. 3109.04 typically involve disputes evolving from divorce actions, thereby involving two parents, both of whom are usually equally qualified to raise the child. Id at 96. Accordingly, the proper inquiry would be what is in the best interest of the child as opposed to determining parental unsuitability. Id. Conversely, when the custody proceeding arises under R.C. 2151.23(A)(2), it usually involves disputes between parents and non-parents,

thus requiring a test that will adequately protect the fundamental right of parents to the custody of their children, and, hence, the requirement that parental unsuitability must be found before the trial court may award custody to a non-parent. Id. See, also, *Hockstok*, 98 Ohio St.3d 238, at ¶19.

**{¶34}** However, even though the change of circumstances test and best interest of the child test are to be applied when modifying custody pursuant to R.C. 3109.04, the Supreme Court of Ohio has extended the requirement that parental unsuitability be found when awarding custody of a child to a non-parent even when the custody proceeding arises in the domestic relations court under R.C. 3109.04. See Id. at 244. The reason for undertaking a parental unsuitability analysis under these circumstances is clear; even though the custody proceedings arise under R.C. 3109.04, the rationale for the test, to protect the fundamental right of parents, exists because the custody proceedings are between a parent and a non-parent.

*Mindy's Fundamental Custodial Rights*

**{¶35}** In the case sub judice, the custody proceedings were conducted in juvenile court under the jurisdiction of R.C. 2151.23(A)(2). Accordingly, in order to modify the Hewitts' custody and grant custody to Mindy, the trial court was required to find a change of circumstances and that it was in Claudia's best interest to be in Mindy's custody. Although the trial court found that a change of

circumstances occurred and that a modification of custody was in Claudia's best interests, we find that the existence of Mindy's custodial rights trumped the Hewitts' legal custody, thereby supporting a modification of custody.

**{¶36}** Parental unsuitability, which must be found to terminate a parent's fundamental right to custody, is established where the parent abandoned the child or where the parent contractually relinquished custody of the child. *Perales*, 52 Ohio St.2d 89, at syllabus. Even though the Hewitts were granted legal custody of Claudia through Mindy's voluntary relinquishment of custody, this does not amount to abandonment or contractual relinquishment that could support a finding of unsuitability and terminate Mindy's custodial rights.

**{¶37}** R.C. 2151.011(B)(19) defines legal custody as follows:

> **[A] legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care,** *all subject to any residual parental rights, privileges, and responsibilities***.**

(Emphasis added). Furthermore, abandonment is "relinquishment 'with the intent of never again resuming or claiming one's rights or interests in.'" *Huff*, 2007-Ohio-5194, at ¶25, quoting *In re Masters* (1956), 165 Ohio St. 503, 505-506.

**{¶38}** Here, the Hewitts were granted legal custody of Claudia, which, under R.C. 2151.011(B)(19), enabled Mindy to retain her parental rights, including her fundamental right to custody. See *Hockstok*, 98 Ohio St.3d 238, at

-30-

¶36. Furthermore, when the Hewitt's were granted legal custody of Claudia, the trial court did not make a finding of parental unsuitability in regards to Mindy. Additionally, the uncontroverted testimony at the reallocation proceedings established that the custody agreement was only meant to be temporary, until Mindy was able to establish herself as a suitable parent, further evidencing that she did not contractually relinquish custody to or abandon Claudia. Accordingly, because Mindy's custodial rights were still intact, and because of the importance of a parent's custodial rights, evidenced through Ohio case law, we find Mindy's custodial rights gave her preeminence over the Hewitt's legal custody, thereby supporting a modification of custody.

*Change of Circumstances and Best Interest of the Child*

{¶39} Turning now to Paul's assignment of error, we first address his argument that insufficient evidence supported the magistrate's finding that a change of circumstances occurred.

{¶40} At trial, Paul testified that his health problems had increased over the last several years, and that those problems prevented him from doing certain tasks. Additionally, Mindy testified to the changing relationship between her and Claudia, including that Claudia looked at her as more of a mother than a sister; that Claudia had begun maturing and asking her questions about her body and religion; that Claudia had developed a relationship with James and her half-brother

and half-sister; and, that Claudia was now able to stay at her house without any problems, whereas, before, she did not like to stay away from the Hewitts' residence. Furthermore, Mindy also testified to Paul's continuing decline in health, stating that his health prevented him from having substantial involvement with Claudia, which was further supported by Paul's lack of knowledge regarding the name of Claudia's school and by the fact that he had not met any of her teachers.

**{¶41}** Although the evidence on the change of circumstances is not prolific, it is certainly sufficient to find that there has been "'a change of substance, not a slight or inconsequential change,'" *Green v. Green*, 3d Dist. No. 14-03-29, 2004-Ohio-185, ¶7, quoting *Davis*, 77 Ohio St.3d at 418, and that the trial court did not abuse its discretion in finding a change of circumstances existed.

**{¶42}** Within his assignment of error, Paul next argues that the trial court erred in adopting the magistrate's decision to modify custody because the trial court did not find that the change of circumstances had a material effect on Claudia.

**{¶43}** This Court previously stated in *Stout v. Stout*, 3d Dist. No. 14-01-10, 2001-Ohio-2293, that the change of circumstances must be one that has a material effect on the child. However, nowhere in that opinion did we find that the trial court must make an explicit finding of material effect. In fact, in subsequent cases

in which we stated that the change of circumstances must have a material effect on the child, we have never required the trial court to make a finding of material effect; instead, the evidence must merely demonstrate material effect. See *Green*, 2004-Ohio-185; *In re Tolbert v. McDonald*, 3d Dist. No. 1-05-47, 2006-Ohio-2377; *McLaughlin v. McLaughlin-Breznenick*, 3d Dist. No. 8-06-06, 2007-Ohio-1087. See, also, *Fultz v. Fultz*, 6th Dist. No. E-84-36, 1985 WL 7512 (citing to the same case as *Stout* (*Wyss v. Wyss* (1982), 3 Ohio App.3d 412) for the proposition that a change of circumstances must be one that has a material effect on the child, and finding material effect implicit the trial court's finding).

{¶44} Here, the evidence on the change of circumstances was clearly a change that had a material effect on Claudia. Paul's failing health prevented him from devoting the same amount of time to the child, and the evidence on Claudia's closer relationship with her step-siblings, step-father, and her mother all demonstrate circumstances that would materially effect Claudia. Accordingly, we find that the evidence properly demonstrates that the change of circumstances was one that had a material effect on the child.

{¶45} Finally, Paul argues within his assignment of error that there was insufficient evidence on the best interest factors of R.C. 3109.04(F)(1) contained within the magistrate's findings to enable the trial court to conduct an independent analysis and adopt the magistrate's decision. Accordingly, Paul argues that the

trial court should have referred the matter back to the magistrate to conduct a further hearing to make the requisite findings.

**{¶46}** The trial court, in reviewing the magistrate's decision, may adopt or reject the decision in whole or in part and may make modifications to the decision. Juv. R. 40(D)(4)(b). Additionally, when ruling on objections to the magistrate's decision, the trial court must "undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law." Juv.R. 40(D)(4)(d). See, also, *In re C.M.*, 9th Dist. No. 24380, 2009-Ohio-943, ¶7. However, the magistrate's decision must contain sufficient facts to enable the trial court to make an independent analysis and decision. *In the Matter of Mitchell*, 3d Dist. No. 13-85-53, 1987 WL 28991, citing *Nolte v. Nolte* (1978), 60 Ohio App.2d 227. See, also, *Reese v. Reese*, 3d Dist No. 14-03-42, 2004-Ohio-1395, ¶11. "'The report of a [magistrate] requires at a minimum a statement of the basis of his findings and recommendations in order that the trial court be able to make an independent analysis of the validity of the report before approving it and entering judgment.'" *Nolte*, 60 Ohio App.2d at 229, quoting *Marino v. Marino*, 8th Dist. No. 37173, 1977 WL 201686.

**{¶47}** Here, the magistrate, on the record, set forth the facts presented and her analysis of those facts for almost every best interest factor under R.C. 3109.04(F)(1). However, a transcript of the proceeding was not provided to the

trial court. Accordingly, any error with regards to the sufficiency of the magistrate's findings was technically waived. Nevertheless, the trial court still considered the merits of the argument, and although the magistrate did not memorialize these facts supporting the best interest factors and her analysis of the factors in her judgment entry, the recording of the proceeding provided the trial court with the basis of the magistrate's decision to enable the trial court to conduct an independent analysis. Moreover, upon our review of the transcript of the reallocation hearing and the trial court's judgment entry, we find that the trial court conducted an independent analysis of the magistrate's decision, as the trial court's judgment entry sets forth an examination of the evidence of the best interest factors with the court's conclusion on the factors. Accordingly, we find no merit to Paul's argument that the trial court did not conduct an independent analysis of the magistrate's decision because her decision failed to set forth sufficient evidence on the best interest factors of R.C. 3109.04(F)(1).

{¶48} Because we find that there was sufficient evidence demonstrating a change of circumstances having a material effect on Claudia; that the magistrate's decision contained sufficient evidence of the best interest factors of R.C. 3109.04(F)(1); that the trial court conducted an independent analysis of the magistrate's decision; and, that Mindy possessed a fundamental right to the care

and custody of Claudia, we find that the trial court did not abuse its discretion in modifying custody.

{¶49} Accordingly, Paul's first assignment of error is overruled.

*Assignment of Error No. II*

{¶50} In his second assignment of error, Paul argues that the trial court erred in considering the best interest factors of R.C. 3109.04(F)(1). Specifically, he contends that the trial court misunderstood the testimony presented at the reallocation hearing when it found that he and Terri failed to abide by the magistrate's April 2008 order granting Mindy parenting time, and subsequently found that Mindy was more likely to follow court-approved parenting time and visitation pursuant to R.C. 3109.04(F)(1)(f), as the testimony at the hearing was that they limited Mindy's visitation with Claudia prior to any court-ordered parenting time because they did not feel it was in Claudia's best interest, not that they limited Mindy's visitation in direct violation of the magistrate's order granting parenting time.

{¶51} We review a trial court's modification of custody for abuse of discretion, as set forth in our disposition of the first assignment of error.

{¶52} The testimony at the reallocation hearing established that the Hewitts limited Mindy's visitation time with Claudia prior to the magistrate's April 2008 order granting Mindy parenting time. Additionally, at the time the Hewitts limited

Mindy's visitation, there was no court-ordered parenting time, as the January 2005 order granting legal custody of Claudia to the Hewitts did not set forth parenting time for Mindy. Furthermore, although Mindy filed several motions with the trial court purporting to argue that the Hewitts were not abiding by the court-approved parenting time, no testimony was presented on this issue at the reallocation hearing. Moreover, although the magistrate made a finding that Mindy was more likely to honor court-approved parenting time, she did not find that the Hewitts failed to abide by her April 2008 order. Consequently, we find that the trial court misunderstood the testimony presented at the reallocation hearing and erred in finding that the Hewitts did not abide by the magistrate's April 2008 order.

{¶53} However, even though the trial court erred in finding that the Hewitts failed to abide by the magistrate's ordered parenting time, we do not find that the trial court abused its discretion in finding that Mindy was more likely to honor court-approved parenting time and visitation pursuant to R.C. 3109.04(F)(1)(f). The trial court also listed as grounds for its finding that Paul has been opposed to Mindy having custody of Claudia because she had not met his expectations. Furthermore, the magistrate found that Mindy was more likely to abide by court-approved parenting time and visitation even though she did not find that the Hewitts failed to honor her April 2008 parenting time order. Therefore, we find that the trial court's conclusion that Mindy was more likely to honor

court-approved parenting time pursuant to R.C. 3109.04(F)(1)(f) was supported by competent, credible evidence.

{¶54} Accordingly, Paul's second assignment of error is overruled.

{¶55} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**PRESTON, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**