[Cite as *Kelly v. Kelly*, 2014-Ohio-354.]


# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### HANCOCK COUNTY


AMY M. KELLY,

    PLAINTIFF-APPELLEE,          CASE NO. 5-13-10

    v.

DANIEL J. KELLY, II,           O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Hancock County Common Pleas Court
Domestic Relations Division
Trial Court No. 2011 DR 280

Judgment Affirmed

Date of Decision: February 3, 2014


APPEARANCES:

    *William Clark* for Appellant

    *Dean Henry* for Appellee

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Daniel J. Kelly ("Daniel") brings this appeal from the judgment of the Court of Common Pleas of Hancock County, Domestic Relations Division, granting a decree of divorce to plaintiff-appellee Amy M. Kelly ("Amy"). Daniel challenges the judgment on the grounds that the trial court did not consider the best interests of the children, that it was an abuse of discretion to name Amy as the residential parent, and that the decision of the trial court was against the manifest weight of the evidence. For the reasons set forth below, the judgment is affirmed.

{¶2} Daniel and Amy were married on July 10, 1999. Doc. 1. During the marriage, two children were born: Danny in 2003 and Maria in 2008. Doc. 1. On July 1, 2011, Amy filed a complaint for divorce alleging that Daniel was guilty of adultery, habitual drunkenness, extreme cruelty and gross neglect of duty. Doc. 1. Amy requested that the trial court grant the divorce, provide an equitable division of all assets and liabilities, require Daniel to pay all attorney fees and costs, award her residential parent status, order Daniel to pay child support, and order Daniel to pay spousal support. Doc. 1. Amy also filed a motion for a temporary restraining order giving her exclusive use of the marital home among other things. Doc. 10. The trial court granted Amy's motion for the temporary restraining order on July 6, 2011. Doc. 20. On July 7, 2011, the magistrate issued a temporary order

ordering that Daniel have the children Monday and Tuesday, Amy have the children Wednesday and Thursday, and that they alternate the weekends. Doc. 25, 1. The order also required the parties to communicate concerning the children via text message only. Doc. 25, 2.

{¶3} Daniel filed his answer and counterclaim for divorce on January 4, 2012. Doc. 41. In the counterclaim, Daniel requested that he be granted a divorce on the grounds that Amy was guilty of gross neglect of duty and extreme cruelty and that the parties were incompatible. Doc. 41, 2. Daniel also asked the court to provide an equitable division of all assets and liabilities and to make a fair and equitable judgment regarding the parental rights and responsibilities of the children. *Id.* Amy filed her reply to the counterclaim on January 18, 2012. On January 25, 2012, Daniel filed his proposed shared parenting plan. Doc. 44. Daniel's plan continued the temporary orders. Doc. 44.

{¶4} On January 26, 2012, the trial court entered its order modifying the temporary orders based upon the agreement of the parties. Doc. 48. The modified order continued the shared parenting plan, but required that both parties allow the other to have the right of first refusal for caring for the children when the other cannot. *Id.* As part of the agreement, the parties attached a child support worksheet that listed Amy's child care expenses at $6,340 per year and Daniel's as

zero. *Id.* Daniel was ordered to pay $471.33 per month in child support to Amy. *Id*

{¶5} The divorce hearing was held on September 17 and 18, 2012. At the beginning of the proceedings, the parties entered a stipulation as to the division of assets and liabilities. Tr. 6-9, Jt. Ex. 1, Tr. 132-36, 265-66. The parties also agreed that the grounds for the divorce would be incompatibility. Tr. 10-11. Tr. 132, 265. The witnesses testified as to various areas.

### The Children

{¶6} Amy testified that at the time of trial, Danny was nine years old and was in the fourth grade. Tr. 15. Maria is in preschool. Tr. 16. Maria attends the preschool from 8:00 a.m. until 4:00 p.m., possibly 5:00 p.m. Tr. 16. Maria was expected to attend kindergarten starting in August of 2013. Tr. 17. Amy testified that she is a kindergarten teacher at the same school that Danny attends. Tr. 18, 23. She has a "Masters in art of teaching education" and a Bachelor's degree in social science. Tr. 21. Amy testified that she pays an additional $198 per month to have health insurance for the children. Tr. 27. The health insurance covers dental and vision as well. Tr. 28. Daniel confirmed this in testimony when he stated that Amy provides the healthcare for the children because her employer provided policy was cheaper than that provided by his employer. Tr. 288-89.

{¶7} As for daycare for Danny, Amy testified that Danny comes to her classroom before or after school rather than paying for daycare, though he may have to go to before and after school care ("FABBS") if she has a meeting. Tr. 29. Due to the limited times Danny goes to FABBS, the cost is $12 to $13 per session. Tr. 30-31. Amy testified that since January 26, 2012, she has not had any daycare expenses for Danny. Tr. 260. When Danny is with her, he gets a breakfast that has less sugar than the one provided by FABBS. Tr. 31. On Amy's days, Danny does not have to attend FABBS, but when he is with Daniel, he may have to go because he gets to the school before she does. Tr. 32. Amy testified that she has to be at work by 8:00 a.m., but Daniel also has to be at work by 8:00 a.m., so Danny may get dropped off before she arrives. Tr. 34-35. Daniel testified that he has childcare expenses for Danny. Tr. 289. In the prior school year, Daniel had spent $1,220 for Danny to attend FABBS. Tr. 290. Daniel also testified that he would not be opposed to dropping Danny off at Amy's house in the morning for her to take to school if that is what the court preferred. Tr. 291.

{¶8} Amy testified that Maria attends a Montessori preschool every day during the school year. Tr. 16. Since Amy is a teacher with the summer off, Maria stays with her during that time and does not attend daycare. Tr. 259. The cost of the Montessori school is over $400 a month and the cost is split equally between Amy and Daniel. Tr. 259. Since January 26, 2012, Amy had no

additional daycare costs for Maria. Tr. 260. Daniel also testified that he and Amy split the cost of the Montessori school with both paying one half of it each month. Tr. 289.

## Danny's Counseling

{¶9} Amy testified that Danny has been in counseling from July 2010 until February 2012. Tr. 47 Dr. Rooney recommended that Danny be in counseling because of his ADHD. Tr. 74. The counseling ceased because Daniel withdrew his consent. Tr. 48. Amy testified that Daniel stopped the counseling because he believed it was confusing Danny and that Danny was fine. Tr. 48. Amy disagrees with that decision and believes that Danny needs "intensive counseling", Tr. 45, 49. For the prior couple of years, Danny has struggled with high anxiety that has affected his sleep and interaction with other children. Tr. 49. The counselor was attempting to teach him relaxation techniques which Amy found to be effective as long as she guided Danny through them. Tr. 49-50. Amy testified that while Danny was in counseling, she and Daniel would take turns taking him to counseling as both parents were expected to participate in the sessions. Tr. 60. Since the termination of counseling, Danny has developed extreme anxiety towards storms. Tr. 66-67. In addition, Danny has been misbehaving in school and disrespecting his teacher, which has caused the school to suggest additional counseling. Tr. 69-71. Amy admitted that she has not discussed the resumption of

counseling with Daniel, but stated that she did not believe Daniel would change his mind. Tr. 65. Amy did admit on cross-examination that Daniel did not say no more counseling ever, but rather no more counseling until they met with the counselor to determine what the goal was. Tr. 257. When questioned as to whether she would agree to meet with the guidance counselor recommending additional counseling to explore options, her answer was "I guess the question would be why?". Tr. 257. She did eventually agree that she would do so. Tr. 258.

{¶10} Daniel testified that he did not have a problem with Danny being in counseling. Tr. 281. Daniel testified that he wanted to be made aware of the appointments and to be more involved in the counseling. Tr. 281. Daniel indicated that Amy would tell him about the appointments after the fact or that he would learn that Danny had been to a counseling session when he saw the explanation of benefits from the insurance company. Tr. 281-82. Daniel also testified that he originally revoked his consent to the counseling because the counselor told that him she did not need to see Danny anymore. Tr. 305. On cross-examination, Daniel did testify that he would agree to more counseling, but wanted both parents to be involved in the decision making process. Tr. 371. Daniel did agree that based upon Danny's current signs of anxiety, Danny may need more counseling and thought that he and Amy should discuss the details. Tr.

407-08. On the Sunday before the hearing, Amy had texted Daniel regarding the letter from the school guidance counselor regarding Danny's need for additional counseling. Tr. 309. Daniel testified that he had indicated that he wanted the two of them to discuss it with the counselor and that Amy had agreed. Tr. 309-10. Daniel testified that he believes he and Amy can cooperate to serve Danny's needs. Tr. 310.

**Danny's Medical Condition**

{¶11} Danny was diagnosed with ADHD by Dr. Rooney in 2008. Tr. 73. Due to this diagnosis, Amy gives Danny medication every day, except for the weekends when Danny is not prescribed to take it. Tr. 32, 349. Amy keeps all of Danny's medicine and does not give it to Daniel to administer. Tr. 237. Amy claimed she does this at the recommendation of Dr. Rooney. Tr. 424. Amy testified that Danny's medication had been recently changed and that it has a side effect of lethargy in the afternoon which was concerning to both her and Daniel. Tr. 72-73. Amy testified that she and Daniel agree that they need to speak with the doctor concerning the level of the drug that Danny is receiving. Tr. 73. Daniel confirmed Amy's testimony and agreed that he too was concerned about Danny's reaction to his new drug. Tr. 312. Daniel also testified that since Danny's doctor was leaving the area, he and Amy would need to cooperate and agree on a new

physician for Danny. Tr. 310-311. Daniel did deny that he was not capable of giving Danny his medication after breakfast. Tr. 313.

### Communication Issues

{¶12} Both parties agree that they have had communication issues. Tr. 91, 280. Amy testified that communication is almost exclusively by text message or email.[1] Tr. 43. She testified that the tone of the messages was not friendly and she described it as demanding. Tr. 43. Amy admitted that the parties do not communicate well and that she does not want to bother to communicate with Daniel concerning anything she thinks he will disagree about because she expects that he will take it poorly. Tr. 92. Amy described most of Daniel's messages to Amy as angry, demanding, and controlling. Tr. 92. However, Amy admitted that the two do communicate about Danny's school work. Tr. 127. Amy also admitted that she does not bother to tell Daniel of problems she sees and instead chooses to deal with them herself. Tr. 239. Amy admits that she purposefully does not respond to many of Daniel's messages. Tr. 437. She testified that all of the messages are demeaning and controlling. Tr. 438-39. She testified that "I will present and future communicate [sic] in any way, shape or form in the best interest of my kids if I didn't have the dominating, demeaning, demoralizing dictatorship that came back on me every single day of the last fourteen months." Tr. 439.

---

[1] The first interim temporary order issued on July 7, 2011, stated that the "parties shall also further communicate with issues regarding the children by text message only." Doc. 25, 2. This restriction was continued by the January 26, 2012, interim temporary order. Doc. 48.

{¶13} On cross-examination, Amy admitted that Daniel's message to her concerning his request to meet with the counselor was not inappropriate. Tr. 257. When questioned concerning why she was offended by a message offering well wishes for her brother who was in the path of a hurricane, she responded that it was inappropriate because it had nothing to do with the children. Tr. 440. Amy also took offense to a message wishing her a good school year because she again thought it was inappropriate because it had nothing to do with the children. Tr. 442. Amy testified that he should not be contacting her regarding her family or personal life, only about the children directly. Tr. 442.

{¶14} Daniel testified that there were communication issues. Tr. 280. Daniel testified that when he asks Amy a question concerning the children, she often does not reply at all or if she does, it is at the last minute. Tr. 280. Daniel admitted that on a few occasions he had lost his temper in texts or voicemails to Amy. Tr. 410-13. He justified the angry outbursts as the result of Amy ignoring numerous attempts to contact her. Tr. 410-13. For example, Daniel testified that one nasty voicemail with expletives and a threat to contact the police was made when Amy had been at her parents with the children for a month and was not allowing him to contact the children. Tr. 412. After numerous texts and emails requesting contact without a response, he left the rude voicemail. Tr. 413.

**Daniel's Use of Alcohol**

**{¶15}** Amy testified that she is concerned about Daniel's alcohol usage. Tr. 98. She testified that since Daniel had received a citation for OVI in 2011, she was concerned that he would drink and then drive with the children in the car. Tr. 98. Amy testified that she believes that Daniel uses alcohol to treat his anxiety and situational depression. Tr. 100-02. She was also concerned that there would be no one in the home to care for the children if Daniel were intoxicated while the children were present. Tr. 121.

**{¶16}** Dennis Armstrong ("Armstrong"), a former friend of Daniel's, testified for Amy. Tr. 139. He testified that he had visited Daniel while he was in a rehabilitation program for alcohol abuse. Tr. 140. Armstrong testified that at that time, Daniel admitted he had a problem, however he frequently denied it was a problem. Tr. 140-41. Although the two had discussed Daniel's drinking, Daniel always concluded it was not really a problem. Tr. 143. Armstrong testified that he believed Daniel's drinking was causing friction in the marriage and was not good for the children. Tr. 145-46. On cross-examination, Armstrong testified that he had not heard Amy complain about Daniel's drinking until after she filed for divorce. Tr. 148. Daniel had told Armstrong that he only went to the rehabilitation program because Amy had insisted. Tr. 149.

{¶17} Stacy Anast ("Stacy") testified that she would babysit for the children at their home when Daniel and Amy were married. Tr. 156. When babysitting, she observed many empty beer cans lying around the home. Tr. 158. Stacy also testified that although she saw Amy drink an occasional glass of wine, she had never seen her drink a beer. Tr. 158.

{¶18} Lori Ann Anast ("Lori Ann") testified that she has worked with Amy and is a friend of hers. Tr. 167. She testified that after the domestic violence instance when Amy was arrested, Amy lived with her and she would pick up the children from Daniel for Amy. Tr. 170. Lori Ann indicated that although the house was usually clean, she did observe several beer cans in the trash one day. Tr. 170. Although Lori Ann has never seen Daniel intoxicated around the children, she has seen him "highly intoxicated" at two different parties. Tr. 184. She admitted that Amy was also drinking while at the parties, "but not excessively." Tr. 184.

{¶19} Frances Kasmarek ("Kasmarek") testified that she was a neighbor and friend of Amy and Daniel. Tr. 191. For a few months, Kasmarek cleaned their home for them. Tr. 197. She testified that when she cleaned she would find beer cans and bottles in the cupboard underneath the sink of both the master bath and the children's bathroom. Tr. 197-98. She also saw several beer cans and bottles in the various trash cans. Tr. 197-98. Kasmarek testified that she had

never seen Amy drink alcohol and rarely saw Daniel drink. Tr. 199. However, on the night that the police came, she could smell beer on Daniel's breath. Tr. 199.

{¶20} Daniel testified that Amy first began complaining about his alcohol use in September or October of 2010. Tr. 266. Eventually, Amy told him he needed to seek treatment for alcoholism or she would leave and take the children. Tr. 267. Daniel then agreed to go to Arrowhead Behavioral Health for rehabilitation. Tr. 267. When he came home from Arrowhead, he did not drink for eight days. Tr. 269. However, he and Amy then got into a physical confrontation and he began drinking again. Tr. 269-70. Daniel admitted that in November of 2011, he was cited for OVI. Tr. 284. He had been to a work function and the children were with Amy as it was her weekend. Tr. 284. He tested a .13, entered a plea, and was given driving privileges. Tr. 286-87. Daniel testified that this was his first and last offense and that he had been restored to full driving privileges. Tr. 287. On cross-examination, Daniel admitted that he had a drink before he went for treatment. Tr. 336. However, Daniel denied that he was an alcoholic or had a problem with alcohol. Tr. 340-42. Daniel also admitted that on June 28, 2012, the day the domestic violence incident occurred, he had drank two beers earlier in the day. Tr. 352. The next day, he had texted Armstrong, who responded that it was Daniel's drinking that had caused all the problems. Tr. 344.

**Shared Parenting Plan**

{¶21} Amy testified that she did not believe that the shared parenting plan would work because Daniel was "demanding demeaning, and telling you what to do." Tr. 58. She also did not believe that the shared parenting plan was in the best interest of the children because Daniel did not always meet the needs of the children. Tr. 80. She testified that Daniel would send Danny to school without breakfast and expect him to eat the breakfast at FABBS which had "pretty high sugar content." Tr. 31, 80. She testified that if Danny were with her, he would be "able to eat a good breakfast." Tr. 31. She also testified that Daniel will send Danny to lunch with not enough lunch. Tr. 80. She also testified that Maria was sent to preschool once without enough pull-ups and she had to take some over at lunch. Tr. 80. She has also had to take a lunch to Maria when Daniel failed to provide one. Tr. 80. On another occasion, Amy was unhappy because Daniel allowed Maria to go to preschool wearing sandals and was injured when she fell off the swing. Tr. 82. As a result, Amy took a pair of Danny's old tennis shoes in case Daniel ever let her wear her sandals. Tr. 82. Amy also testified that when they went camping in August, Maria had a severe rash on her bottom because Daniel did not clean Maria's bottom well enough when she woke up with a wet pull-up. Tr. 82. Amy was also concerned that Daniel sent Danny to school in clothes that were too small and he might get picked on. Tr. 88. Since then, Amy

has chosen to keep additional clothes at school for Danny rather than discuss the issue with Daniel. Tr. 89. She also was unhappy that Daniel bought Danny tennis shoes with Velcro straps and allowed him to wear them although she had bought him tennis shoes which tie because she wants him to learn to tie his shoes. Tr. 88-89. Again, she was concerned that he would be teased for having shoes with Velcro. Tr. 89. Amy admits that she has not addressed these issues with Daniel because he "only hears what he wants to hear when he wants to hear it." Tr. 89. Amy indicated that she believes that it would be best for the children to be in one place during the week to allow for better consistency and to allow her to help Danny with his homework. Tr. 122-23.

{¶22} On cross-examination, Amy admitted that Daniel has given her additional time with the children than required. She testified that Daniel has on several occasions given Amy permission on his days to pick up Maria from preschool early and to pick up Danny and keep them until he is off work. Tr. 233. Amy also admitted that one of the side effects of Danny's new medicine is that it has increased his appetite and he is eating more, which is why the lunches sent are inadequate. Tr. 238-39. Amy has not notified Daniel that this is a problem instead choosing to just keep extra food for Danny in her classroom. Tr. 239.

{¶23} Daniel testified that he believed the parenting plan had worked well and that he utilized Amy for childcare pursuant to the agreement. Tr. 279. Daniel

testified that prior to the agreement, there was a civil protection order preventing Amy from having the children, but they worked out this agreement and he agreed to lift the order. Tr. 278. Daniel testified that he did so because the children needed to see their mother as well as their father. Tr. 279. He testified until the morning of court, Amy had never requested any changes to the schedule to him. Tr. 28. During the fourteen months the plan has been in effect, the two of them had worked out changes to the schedule for vacations, work changes, grandparent visits and other instances. Tr. 292-93. Daniel testified that when his driving privileges were restricted, Amy had agreed to take the children to church. Tr. 296. Daniel wanted to continue the current schedule rather than a week to week schedule because he thought a week was too long for the children to be without the other parent. Tr. 325-26. Daniel also denied that he had ever failed to meet the basic needs of the children. Tr. 326.

**Parenting Skills**

{¶24} Amy testified that she would be the better parent to be granted residential status because she has sixteen years of experience through her occupation with children of Danny's age that have similar issues while Daniel has no experience. Tr. 55. Prior to the parties' separation, Amy was the one who made all the household decisions regarding the children. Tr. 56. When the parties were together, Amy was responsible for the day to day care of the children. Tr.

129. Daniel was, at that time, traveling for work, so Amy was a stay at home mother. Tr. 130-31. Amy testified that the decision for her to stay home and later to work part time was her desire because she did not want to be separated from the children and that Daniel had agreed to this. Tr. 131. Amy also testified that her house is more appropriate because the children have their own rooms, while at Daniel's home, the children share not only a room, but a queen size bed. Tr. 86. She finds it inappropriate for a nine year old boy and a four year old girl to share a bed and is also concerned that it may disturb Danny's sleep. Tr. 86-87. Amy again admitted that she has not discussed this issue with Daniel. Tr. 870. She also testified that she believed the children should be attending mass as well as church class every week. Tr. 93. She was upset that Daniel did not make the children attend mass every Sunday he had them and thought that he should let her take them on those weekends if he did not wish to do so. Tr. 93-94. Amy did admit that there were several instances where Daniel had asked her to take the children to mass when he was unable to do so. Tr. 94. Amy testified that although both she and Daniel were in contact with Danny's teacher, she had personal contact while Daniel had contact via email. Tr. 123-24. She testified that at one time, Daniel had suggested pulling Danny out of the gifted program because he thought it was too confusing and stressful for Danny. Tr. 124-25. Daniel then requested a

meeting, which was held. Tr. 124-25. After the meeting, Daniel was more comfortable with the program and Danny remained in it. Tr. 125-26.

{¶25} On cross-examination, Amy admitted that Daniel frequently gave her more time with the children than what was required by the plan. Tr. 233. She also testified that on the day of the hearing, which was a Tuesday and Daniel's day with the children, she went to the preschool, took Maria from the school, and took her back to Amy's home so that she could stay with Amy's parents without notifying Daniel that she would be doing so. Tr. 239-40. She just thought it was more important for Maria to be with her grandparents than at school. Tr. 241-42. Amy also admitted that despite her concerns about Daniel's drinking, she knew of no investigation concerning him neglecting the children. Tr. 242. She admitted that CSB had sent her a letter indicating that they had substantiated a claim of neglect against her for the July 28, 2011, incident. Tr. 245-47. As a result of that letter, she had contacted an attorney and responded to it. Tr. 246. When questioned about anger issues, Amy denied having any, but admitted that she had scratched Daniel in December of 2010. Tr. 261. She claimed that it was a "very dark time in the family." Tr. 261. During rebuttal, Amy admitted that she had bit Daniel on the hand which led to her being arrested. Tr. 425. She claimed that it was self-defense and claimed that Daniel was the one with the anger issues. Tr. 425, 430.

{¶26} Stacy testified that when she babysat for the children, most of her interactions were with Amy. Tr. 157. She testified that Amy was a more "hands on" parent while Daniel was more likely to leave when she arrived. Tr. 159.

{¶27} Lori testified that Amy is a "very caring and nurturing mother." Tr. 169. She testified that Amy was arrested and incarcerated for domestic violence and that she had come to stay with her afterward. Tr. 170. She also testified that Amy has a reputation for being honest and a little controlling. Tr. 174. In Lori's opinion, Amy was a little controlling with her children and had high expectations, though "nothing out of line as a mother". Tr. 174.

{¶28} Kasmarek testified that ever since the incident on June 28, 2011, Danny has acted scared and his personality has changed. Tr. 195-96. When Amy was arrested, the children spent the night at her home, and Danny was scared. Tr. 200-02. She does not believe that the children are afraid of Amy. Tr. 205. The night of the arrest, she had gone over to the home and saw the children in Amy's parents' car. Tr. 215-220. That night, Amy's parents spent the night at her home with the children while Daniel was doing other things. Tr. 212. The next morning she did not think that Danny wanted to go with Daniel. Tr. 221. Daniel and the children then lived for the next two months at the house with the children. Tr. 221. While Amy was out of the home, Daniel was not as good at keeping the house clean as Amy had been. Tr. 223.

{¶29} Daniel testified that on June 28, 2011, he and Amy were arguing and she bit his right hand. Tr. 271. Both Danny and Maria were present when this occurred. Tr. 271. After the police arrived, they questioned everyone and then Amy was arrested. Tr. 274. The next day, an investigator from Hancock County Job and Family Services contacted him and questioned him about what had happened. Tr. 275-76. Daniel then received a letter indicating that neglect allegations against Amy had been substantiated. Tr. 276. Between the time of Amy's arrest and the shared parenting agreement, Amy had no contact with the children as there was a civil protection order prohibiting it. Tr. 277-28. Daniel testified that he is living in a rental property that has two bedrooms. Tr. 297. The children share a queen bed, but he was in the process of buying a twin bed for Maria. Tr. 2987. Daniel testified that he intended to buy another home in Findlay after the divorce was final. Tr. 298. Daniel testified that he took his current job to allow him more time with his family even though he made less money than his prior job. Tr. 300. Since he started working at Cooper, he has been offered three promotions, but has refused them all because they would require him to move out of state and he did not want to leave his children. Tr. 301. Daniel also testified that he has frequent contact with Danny's teacher and has recently contacted her because of Danny's problem in class. Tr. 314-15. Daniel admitted that he considered removing Danny from the gifted program. Tr. 315-317. However,

after the conference with Amy and the teachers in the program, the issues were worked out and Danny is still in the program and doing well. Tr. 317-18. Although there have been some things on which Daniel and Amy have cooperated, Daniel agrees there were some issues. Tr. 319. For example, Danny had previously played basketball, but Amy did not agree to let him play this year. Tr. 319. Amy did not want Danny to do it because it interfered with "too many family commitments" on her time. Tr. 320. Another example was Amy signing Maria up for t-ball in the mornings during the summer when he cannot participate, even though he would have liked to do so and there were evening sessions available. Tr. 320-21. Daniel testified that the children were in multiple activities. Tr. 321. Danny is in football and Daniel is one of the coaches. Tr. 321-22. Maria is in dance and Daniel goes to her sessions. Tr. 322. Danny is also in cub scouts, but the meetings were on Wednesdays, which is Amy's time, so he is not involved. Tr. 322. Daniel was unhappy that the Pinewood Derby was on his weekend and Amy did not tell him about it in time to help Danny with the car, instead allowing another father in the group to do so. Tr. 323-24.

{¶30} On cross-examination, Daniel admitted that he had previously been treated with medications for anxiety and mild depression. Tr. 345, 47. Daniel also admitted that on the night of the domestic violence, he was angry. Tr. 352-53. Daniel testified that it occurred because Amy had been gone with the kids for a

month at her parents' home in Michigan. Tr. 352-53. Upon her return, she informed him that her parents were coming to their home that day and he did not want them to come. Tr. 354-55. Daniel was concerned that Amy's parents were coming to take the children again. Tr. 354-55. While Daniel was holding Maria, Amy tried to take her and he would not hand her over, so Amy bit him. Tr. 356-57. When the children were placed in Amy's father's car, he was upset because he thought they were trying to leave with the children. Tr. 357-58.

{¶31} On October 1, 2012, the magistrate entered her decision. Doc. 77. The magistrate accepted the stipulations of the parties and found that the parties were incompatible and accepted the property division set forth in Joint Exhibit 1. Doc. 77, 12. On October 15, 2012, Daniel filed his preliminary objections to the decision along with a request for an extension of time to file objections to allow the transcript to be prepared. Doc. 78. The trial court granted the extension on October 15, 2012. Doc. 80. On October 17, 2012, Amy filed a motion for an interim order to institute the magistrate's decision temporarily while the trial court considered the objections. Doc. 81. Daniel filed a memorandum in opposition to this motion on October 25, 2012.[2] Doc. 82.

{¶32} On December 10, 2012, Daniel filed his objections to the magistrate's decision. Doc. 86. Daniel objected to the magistrate's ruling 1)

---

[2] A second memorandum in opposition to Amy's motion was filed on October 26, 2012. Doc. 83.

denying his request for shared parenting, 2) naming Amy as the residential parent and reducing his parenting time, 3) finding that Amy's physical assaults on Daniel were irrelevant, 4) finding that the parties were unable to communicate, and 5) finding that Daniel had stopped Danny from obtaining counseling. *Id.* Amy filed her response to Daniel's objections on December 27, 2012. Doc. 88. The trial court reviewed the objections and on February 6, 2013, entered its judgment overruling the objections and adopting the magistrate's decision. Doc. 90. The judgment entry granting the divorce was entered by the trial court on March 25, 2013. On April 11, 2013, Daniel filed his notice of appeal. Doc. 102. Daniel raises the following assignments of error on appeal.

**First Assignment of Error**

> **It was an abuse of discretion to deny the request for shared parenting because the court did not properly consider the best interests of the children as delineated in [R.C. 3109.04(F)(2)].**

**Second Assignment of Error**

> **In the alternative, even if it is found that the court did not err in denying the shared parenting plan, it was an abuse of discretion to designate the mother the residential parent.**

**Third Assignment of Error**

> **Finally, the decision of the trial court was against the manifest weight of the evidence and therefore the opinion was unreasonable, arbitrary and an abuse of discretion.**

**{¶33}** In the first assignment of error, Daniel claims that the trial court erred by denying his request for shared parenting. The allocation of parental rights is within the sound discretion of the trial court. *Hewitt v. Hewitt*, 3d Dist. Union No. 14-08-48, 2009-Ohio-6525, ¶ 25. An appellate court should not reverse a child custody decision that is supported by a substantial amount of credible evidence absent an abuse of discretion. *Id.* (citing *Bechtol v. Bechtol*, 49 Ohio St.3d 21, 550 N.E.2d 178 (1990)). "The abuse-of-discretion standard is defined as '[a]n appellate court's standard for reviewing a decision that is asserted to be grossly unsound, unreasonable, illegal, or unsupported by the evidence.'" *State v. Gutierrez,* 3d Dist. Hancock No. 5-10-14, 2011-Ohio-3126, ¶ 43 quoting *State v. Boles*, 187 Ohio App.3d 345, 2010–Ohio–278, 932 N.E.2d 345, ¶ 18 (2d Dist.).

> **(A)  In any divorce * * * pertaining to the allocation of parental rights and responsibilities for the care of a child, upon hearing the testimony of either or both parents and considering any mediation report * * *, the court shall allocate the parental rights and responsibilities for the care of the minor children of the marriage. Subject to division (D)(2) of this section, the court may allocate the parental rights and responsibilities for the care of the children in either of the following ways:**
>
> **(1)  If * * * at least one parent files both a pleading or motion and a shared parenting plan under [division (G) of this section] but no plan for shared parenting is in the best interest of the children, the court, in a manner consistent with the best interest of the children, shall allocate the parental rights and responsibilities for the care of the children primarily to one of the parents, designate that parent as the residential parent and the legal custodian of the child, and divide between the parents the other rights and responsibilities for the care of the children,**

**including, but not limited to, the responsibility to provide support for the children and the right of the parent who is not the residential parent to have continuing contact with the children.**

**(2) If at least one parent files a pleading or motion in accordance with division (G) of this section and a plan for shared parenting pursuant to that division and if the plan for shared parenting is in the best interest of the children and is approved by the court in accordance with division (D)(1) of this section, the court may allocate the parental rights and responsibilities for the care of the children to both parents and issue a shared parenting order requiring the parents to share all or some of the aspects of the physical or legal care of the children in accordance with the approved plan for shared parenting. \* \* \***

**\* \* \***

**(D)(1)(a) Upon the filing of a pleading or motion by either parent or both parents, in accordance with division (G) of this section, requesting shared parenting and the filing of a shared parenting plan in accordance with that division, the court shall comply with division (D)(1)(a)(i), (ii), or (iii) of this section, whichever is applicable:**

**\* \* \***

**(iii) If each parent makes a request in the parent's pleadings or files a motion but only one parent files a plan, or if only one parent makes a request in the parent's pleadings or files a motion and also files a plan, the court in the best interest of the children may order the other parent to file a plan for shared parenting in accordance with division (G) of this section. The court shall review each plan filed to determine if any plan is in the best interest of the children. If the court determines that one of the filed plans is in the best interest of the children, the court may approve the plan. If the court determines that no filed plan is in the best interest of the children, the court may order each parent to submit appropriate changes to the parent's plan or**

**both of the filed plans to meet the court's objections or may select one filed plan and order each parent to submit appropriate changes to the selected plan to meet the court's objections. If changes to the plan or plans are submitted to meet the court's objections, and if any of the filed plans with the changes is in the best interest of the children, the court may approve the plan with the changes. If changes to the plan or plans are not submitted to meet the court's objections, or if the parents submit changes to the plan or plans to meet the court's objections but the court determines that none of the filed plans with the submitted changes is in the best interest of the children, the court may reject the portion of the parents' pleadings or deny the parents' motion or reject the portion of the parents' pleading or deny their motions requesting shared parenting of the children and proceed as if the request or requests or the motion or motions had not been made. * * ***

**(b)   The approval of a plan under division (D)(1)(a)(ii) or (iii) of this section is discretionary with the court. The court shall not approve more than one plan under either division and shall not approve a plan under either division unless it determines that the plan is in the best interest of the children. If the court, under either division, does not determine that any filed plan or any filed plan with submitted changes is in the best interest of the children, the court shall not approve any plan.**

**\* \* \***

**(F)(1) In determining the best interest of a child pursuant to this section \* \* \*, the court shall consider all relevant factors, including, but not limited to:**

**(a)   The wishes of the child's parents regarding the child's care;**

**\* \* \***

**(d)   The child's adjustment to the child's home, school, and community;**

**(e) The mental and physical health of all persons involved in the situation;**

**(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;**

**\* \* \***

**(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; \* \* \* whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;**

**\* \* \***

**(2) In determining whether shared parenting is in the best interest of the children, the court shall consider all relevant factors, including but not limited to, the factors enumerated in section 3119.23 of the Revised Code, and all of the following factors:**

**(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;**

**(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;**

**(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence or parental kidnapping by either parent;**

    **(d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting[.]**

R.C. 3109.04.

**{¶34}** In this case, Daniel is claiming that the trial court abused its discretion by denying his motion for shared parenting. Daniel claims that the alleged problems with the shared parenting plan he proposed, which was a continuation of the plan they had been using for the prior fourteen months, were all ones created by Amy. Daniel argues that rather than considering what was in the best interest of the children, the trial court accepted Amy's refusal to cooperate and communicate as a joint problem even though there was no evidence that he had refused to communicate or cooperate. In ruling on Daniel's objections, the trial court made the following conclusions.

> **In support of her opinion, the Magistrate referenced several important findings. First, the Magistrate found that Plaintiff's training as a teacher would be an invaluable asset to assist in providing a stable home environment. In comparison, the Magistrate pointed to father's history of unresolved alcohol abuse and either inability or unwillingness to create or maintain appropriate structure in his home as serious impediments to shared parenting.**

> **Second the Magistrate also addresses the lack of meaningful communication between the parents as a significant factor in her decision. A vital precondition to a shared parenting plan is communication between former spouses. R.C. 3109.04(F)(2)(a). This reoccurring difficulty between [Amy] and [Daniel] is all too [common] in the divorce proceedings. It is unfortunate that they**

**both have allowed personal animosities to impact the emotional [wellbeing] of their children.**

**On this point, the Court agrees with the Defendant that all communication difficulties can never be only the fault of only one parent. The evidence shows that [Amy] shares blame for failing to ensure that the lines of communication between them remain open. Without question, [Amy] must do a better job of keeping [Daniel] apprised of counseling appointments, medical issues and extracurricular activities. The record reveals that, at times, [Amy] exercises unilateral authority and control over the children thereby undercutting [Daniel's] position as co-equal parent. To some degree, [Amy's] circumvention of [Daniel's] involvement in his children's lives is of his own making. His inappropriate and crude methods of communication signify a level of immaturity that works against his request for shared parenting. Especially with regard to Danny, important future psychological decisions loom on the horizon. Making [Amy] the residential parent is only [sic] way this court can ensure that important decisions regarding the children are duly considered, but ultimately decided by one voice in the event of an impasse.**

**[Daniel] desires to, and the law provides, that he has the right to spend significant time with his children. Without question, he loves his children and will fulfill an important role in their lives. To that end, the Magistrate's recommendation provides for substantial parenting time. Quantitavely, [Daniel] will have nearly as many days with his children as he currently enjoys under the temporary plan. However, beyond the important bonding and development that occurs when parents and children are together there are also overarching needs that children have such as structure and stability that, in this current climate, can only be met if [Amy] is designated as residential parent. Given their ages and developmental levels, especially in the case of Danny, the "five-two" shared parenting arrangement is too confusing and disjointed. For example, Danny has a regular medication regime that must be followed. He is prone to distraction and emotional regression in stressful situations. At this time, routine and structure are extremely important to his personal development and growth. This can best be**

> **accomplished by having a residential parent in place. After all is considered, the needs of the children must be the focus of this Court.**

Doc. 90, 3-5. The trial court adopted the decision of the magistrate including the conclusions of the magistrate concerning the shared parenting plan. Doc. 90, 6. A review of the magistrate's decision indicates that the magistrate examined all of the factors in R.C. 3109.04(F)(2). The trial court determined that the parties had issues with communicating appropriately with each other. This conclusion was adequately supported by the record and both parties admitted that they had difficulty communicating. Tr. 91, 280. The trial court also considered the testimony that a claim of neglect was substantiated against Amy and that she was arrested for domestic violence in which Daniel was the victim. Doc. 90, 5-6. The trial court concluded that this evidence was outweighed by the evidence that Amy was a fit mother. *Id.* Having considered all of the factors, the trial court determined that the shared parenting plan proposed was not in the best interest of the children. There is substantial, credible evidence in the record to support this finding. Thus, the trial court did not abuse its discretion in denying Daniel's motion for shared parenting. The first assignment of error is overruled.

{¶35} In the second assignment of error, Daniel alleges that the trial court erred by designating Amy as the residential parent. Daniel alleges in the third assignment of error that the decision of the trial court to name Amy as the

residential parent was against the manifest weight of the evidence. Since these two assignments of error raise the same issue, we will address them together. An appellate court has the authority to determine that a decision of a civil court is against the manifest weight of the evidence. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, 972 N.E.2d 517. Although all three judges on an appellate panel must concur to reverse a jury verdict, only two judges must agree to reverse a decision of the trial court in a bench trial. *Id.* at ¶ 7. In *Eastley*, the Ohio Supreme Court set forth the appropriate standard of review for manifest weight arguments in civil cases.

> **"Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"**

*Id.* quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541(1997).

> **[B]ecause "manifest weight of the evidence" refers to a greater amount of credible evidence and relates to persuasion, it does not matter that the burden of proof differs in criminal and civil cases. In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, rather than beyond a reasonable doubt, evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight).**

*Id.* at ¶ 19.

> **In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact.**
>
> **"[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * ***
>
> **"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."**

*Id.* at ¶ 21 quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). If a court of appeals finds that the verdict is against the manifest weight of the evidence, it should remand the case for a new trial. *Eastley, supra* at ¶ 22.

{¶36} In determining what is in the best interest of the children when allocating parental rights, the trial court must review the factors set forth in R.C. 3109.04(F)(1). The trial court, through the adoption of the magistrate's decision considered all of the factors and indicated which facts were supporting its decision. Doc. 77, 14-15. In this case, Amy indicated that she wished to be named the residential parent and Daniel indicated that he would prefer a shared parenting plan. The children were neither interviewed in camera nor by a guardian ad litem, so the trial court did not know the wishes of the children. As to the interaction and relationship between the children and their parents, both parents testified that the children loved both parents. Both Daniel and Amy testified that

she was the primary caregiver during the time they were living together as Daniel worked a job that required travel and Amy was either a stay at home mother or worked part-time during the marriage. Amy testified that she gives Danny his medication every day at the school, ensures that he has enough snacks at school, and generally provides support for him during the day. Stacy testified that Amy was the parent she saw taking care of the children more frequently. Tr. 159. Lori testified that Amy was a "very caring and nurturing mother." Tr. 169. Kasmarek testified that she has never seen any indication that the children were afraid of Amy, but that she believed that Danny did not want to go with Daniel after Amy was arrested. Tr. 205, 221.

{¶37} There was also testimony that the children were happy in the neighborhood where the marital home was located. Tr. 192-93. Amy, pursuant to the agreed property settlement, will be keeping the marital home where each child has his or her own bedroom. There was also testimony that Amy's work schedule permitted her more flexibility for caring for the children as she is on the same basic schedule as a teacher as the children are during the school year. Daniel was renting a two bedroom home and both children were sharing not only a bedroom, but a queen sized bed. Although Daniel expressed an intent to purchase a new home after the divorce and to obtain separate beds for the children, that was not complete at the time of the hearing. There were no concerns about the children's

schooling as both parties were in agreement about the children's education and both parents live close enough to facilitate the decision they had made.

{¶38} There were some issues concerning the mental and physical health of the parties involved. There was substantial testimony that Danny has been diagnosed with ADHD and requires medication and counseling. The medication has side effects that need monitored. Additionally, there was testimony that Daniel has previously suffered from minor depression and was taking medication to treat it. More importantly, there was testimony that Daniel may have an alcohol problem. Although Daniel denied the problem, there was testimony from Amy, Armstrong, Lori, and Kasmarek that Daniel had a problem with alcohol usage. There was testimony that Daniel had sought treatment at one time for alcohol abuse, but did not follow through with the treatment. Daniel does not deny that he sought the treatment, but denies that there is a problem to be treated. Stacy, Lori and Kasmarek all testified to observing numerous empty beer cans around the home and smelling beer on Daniel. Kasmarek even testified that when she cleaned the home, she would find empty beer cans under the sinks in both the master bathroom and the children's bathroom. Finally, Daniel was cited for an OVI during the time the parties were separated.

{¶39} There was no question concerning missed child support payments and this factor was not addressed by the trial court. The trial court also determined

that neither party had withheld time with the children from the other. There was testimony that Daniel did give Amy additional time when requested.

{¶40} The trial court is also required to address any adjudication of neglect or convictions for domestic violence. R.C. 3109.04(F)(1)(h). The evidence in this case indicates that there was a substantiated claim of neglect against Amy. However, Amy testified that no one ever questioned her and there was no testimony that an adjudication of neglect occurred. Instead, the letter indicated that the case had been closed. The letter did not identify what the nature of the claims was. Daniel testified that he was questioned by a social worker after Amy was arrested for domestic violence in June of 2011. He did not testify that anything came of the investigation other than what the letter stated. The trial court addressed the allegation. The trial court also addressed the issue of the domestic violence charge against Amy and the alleged finding of neglect against Amy. The fact that Amy bit Daniel and was arrested for doing so was admitted by Amy and various other witnesses, so Daniel's testimony that it occurred was corroborated. Tr. 425, 170, 200-02, 271-75. No one testified whether Amy was convicted of the charge, only that the act occurred and she was arrested for it. However, the trial court did address both of these issues in reaching its decision.

> **In reaching this conclusion [to name Amy residential parent], this court has also carefully examined the letter "substantiating" abuse by [Amy] and her arrest for domestic violence. * * * [Daniel] maintains that this administrative finding proves that**

> **[Amy] should not be identified as the sole residential parent. This evidence cannot be dismissed out of hand, but by the same token, the Court agrees with the Magistrate that this information cannot be accorded much weight in the overall assessment of the evidence. For example, the undated letter from the Hancock County Dept. of Job and Family Services states that [Daniel's] reported claim of "neglect" was "substantiated" against [Amy]. Strangely, the letter also indicated that the agency was closing the investigation on August 14, 2011. The two paragraph, five line communication fails to expound on how and when this conclusion was reached. No one from the agency was called as a witness to amplify or explain this opinion. Without more, this unsupported conclusion is of little value especially in light of the countervailing evidence to suggest [Amy] is a dutiful and dedicated mother.**

> **With respect the [sic] domestic violence allegation, Amy was never officially charged. Without an admission or finding of guilt or other corroborating evidence beyond that offered by [Daniel], this court declines to construe the claim against [Amy] as evidence of her inability to adequately parent. The Court agrees with the Magistrate's conclusion that this evidence does not overbalance the greater weight of opposing evidence in support of establishing [Amy] as residential parent.**

Doc. 90, 5-6. Although the trial court was mistaken in finding there was no corroborating evidence of the event,[3] it did not dismiss it outright. The trial court still considered it and decided it was outweighed by the other evidence.

{¶41} Having reviewed all of the record, the trial court's decision overruling the objections and the magistrate's decision, as adopted by the trial court in its decision, there is substantial, competent evidence to support the

---

[3] Amy admitted that she bit Daniel, but alleged it was self-defense. Tr. 425. Lori testified that after Amy was arrested for domestic violence, Amy lived with her for a while. Tr. 170, Kasmarek testified that she was present when the police came and that Amy had been arrested for domestic violence. Tr. 220-21.

determination of the trial court naming Amy as the residential parent. Thus, the trial court did not abuse its discretion in doing so. The record also indicates that the greater amount of credible evidence does not indicate that the decision of the trial court was incorrect. Therefore, the finding of the trial court is not against the manifest weight of the evidence. The second and third assignments of error are overruled.

{¶42} Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Court of Common Pleas of Hancock County, Domestic Relations Division is affirmed.

*Judgment Affirmed*

**SHAW, J., concurs.**

**/jlr**

**ROGERS, J., Concurring Separately.**

{¶43} I must concur in the result reached by the majority because of the deference this reviewing court is required to give the trial court. I write separately because of my concern with the cavalier attitude of the magistrate towards this mother's arrest for domestic violence and a substantiated report of child abuse, obviously occurring with the child present. At the same time, the magistrate expresses serious concern for father's use of alcohol even though there is no

evidence of alcohol abuse when the child is present.  I wonder whether the same conclusions would have been reached if the roles had been reversed.

/jlr